**Raymond L. HALL and Quaker City Industries, Inc., a corporation of New York, Plaintiffs,**

v.

**U. S. FIBER PLASTICS CORPORATION, a corporation of New Jersey, Defendant.**

Civ. A. No. 663–67.

United States District Court,
D. New Jersey,
Civil Division.

Aug. 30, 1971.

Lerner, David & Littenberg, by Lawrence I. Lerner and Sidney David, Newark, N. J., for plaintiffs.

Milton, Keans & DeBona, by John Milton, Jr., Jersey City, N. J., for defendant.

## OPINION

COOLAHAN, District Judge:

This patent infringement suit involves a variation of the familiar "backyard", above-ground swimming pool. Plaintiffs charge that similar pools manufactured and sold by defendant are an infringement of Claims 11, 12 and 15 of plaintiffs' United States Letters Patent No. 3,317,926 (hereinafter " '926"). The application was filed on October 26, 1964, and the patent issued on May 9, 1967 to Raymond L. Hall (hereinafter "Hall") the inventor-owner and a plaintiff herein. Said patent is exclusively licensed to Quaker City Industries, Inc. (hereinafter "Quaker City") the other plaintiff herein.

Plaintiff Hall is a resident of the State of New Jersey. Plaintiff Quaker City is a corporation organized and existing under the laws of the State of New York, its principal place of business being located in Carlstadt, New Jersey. Defendant, U. S. Fiber Plastics Corporation, (hereinafter "U. S. Fiber") is a New Jersey corporation having its principal place of business located in Stirling, New Jersey.

This action arises under the patent laws of the United States, and more particularly under 35 U.S.C. § 271 and §§ 281 to 285 of the same title. Jurisdiction is conferred on the Court by 28 U.S.C. §§ 1338 and 1400(b). Plaintiff seeks injunctive relief, an award of damages for infringement, and assessment of costs.

By stipulation at the pretrial conference, plaintiffs' complaint was amended to withdraw their cause of action based upon unfair competition against defendant for allegedly using plaintiffs' trade secrets and confidential information disclosed in confidence to it by plaintiffs. Defendant's counterclaim for unfair competition which alleged that plaintiff maliciously and falsely circulated letters

and oral statements to the effect that defendant was infringing the '926 patent was dismissed at trial. Therefore, the questions of validity and infringement are the sole remaining issues to be determined.

### THE '926 PATENT

The '926 patent relates to swimming pools and more particularly to a swimming pool of prefabricated construction which is circular in shape and has a circular walkway or decking mounted about the upper edge of the pool. Claim 11 is explanatory of how the prefabricated construction is effected by providing:

". . . (1) a base templet ring formed from a plurality of members connected at their ends to form a polygon; (2) a plurality of inner post members of substantially the same length attached at one end to and extending upwardly from the base templet at preselected intervals; (3) a plurality of outer post members attached at one end to and extending upwardly and outwardly from the base templet at preselected intervals; and (4) a decking providing a truss and a walkway and comprising a plurality of members formed into an upper templet ring and attached to the inner and outer post members to provide said walkway substantially parallel to the bottom templet ring."

The circular decking which forms the upper templet ring is not normally in tension when the pool is empty. When the pool is filled with water, however, said upper templet ring is forced into tension with a resulting rigidity of the entire structure thereby established. This upper templet ring is the decking around the pool and thus a rigid walkway about the circular pool is provided. The circular construction utilizes the well known hydrostatic principle that water pressure tends to push out evenly in all directions and, thus, there are even stresses all about the pool. The deck, therefore, is held in tension in a manner characterized by plaintiffs as a "tension ring". There was testimony to the effect that without water, the deck is loose and wobbly and that the water, in essence, is utilized as another structural member.

The file wrapper reveals that at the time the Hall patent application was originally filed in 1964, each embodiment illustrated in the application showed a double walled structure, and every claim in the original patent application was limited to a double walled structure. Several letters written in 1964 by Mr. Hall characterized his "Improved Swimming Pool" as "consisting of a double walled aluminum pool having inner and outer walls bowed toward each other and having a deck and fence."

Claims 11, 12 and 15 which are presently asserted against defendant were not introduced until November, 1966 which is more than two years after the initial filing of the patent application. These were the first claims introduced into the application which were not limited to a double walled pool construction. They were introduced following an interview with the patent office examiner on October 25, 1966 after a notice of allowance of the existing claims was already indicated but had not yet been received by plaintiff Hall's patent agent. The file wrapper reveals that there was also a second interview on January 16, 1967, a third interview on January 17, 1967 and a telephone conversation with the examiner on March 7, 1967 and another on March 8, 1967. What took place during these contacts between the applicant's patent agent and the patent office examiners is not set forth in the file history but presumably these conversations related to issues pertinent to the allowance of the additional claims. As plaintiffs' patent expert, Norman Friedman, testified, "we don't know". The file history is simply not clear why the patent office allowed the late claims of considerably different scope than the original claims or what was the intended interpretation of these late claims.

### DEVELOPMENT OF THE HALL POOL

Plaintiff Hall conceived his pool construction in January-March, 1964 and, after conception, built a prototype of a

pool twenty (20) feet in diameter and four (4) feet deep on the sales lot of Cabana Pools in Fairfield, New Jersey. Completion of the prototype was accomplished some time in May, 1964. Shortly thereafter, Hall's first licensee, Cabana Pools began selling the Hall pool and advertised the same in Trends newspaper beginning on June 14, 1964. As a result of the advertisement, sales were generated, the first being made in June 1964, and the first installation was completed in July, 1964. To-date, plaintiffs have sold approximately 4000 of the Hall pools.

## DEVELOPMENT OF DEFENDANT'S POOL

Defendant, U. S. Fiber & Plastics Corporation, was in the business of manufacturing above ground pools since about 1949, beginning with small wader size pools and eventually working up to the larger twenty-four (24) foot diameter pools.

In 1963, at the suggestion of an aluminum product salesman, defendant began the design of a new series of above-ground, all aluminum circular pools.[1] The basic pool of this series was to include a rugged, extruded aluminum frame surrounding the customary water retaining band. It was to be in two sizes, an 18 foot diameter and a 24 foot diameter. A walk-around deck surrounding the basic pool frame was to be designed as an add-on feature to the twenty-four (24) foot pool; a large sun porch patio was intended as a further add-on feature. Defendant developed this series of pools beginning in 1963 and it is the pools of this series with the add-on walk-around deck and the add-on patio which are accused of infringing the patent in suit. The basic pool with the sturdy extruded aluminum frame (without the add-on deck) was completed and offered to the trade in December, 1963.

1. The salesman, one Joseph Sikorski, was deceased at the time of trial. He was employed during the times herein pertinent by the New Jersey Aluminum Extrusion Company. In an attempt to sell aluminum products to defendant U. S.

Sikorski's drawings showing various designs for the add-on deck for the basic pool were prepared during the latter part of 1963. Drawings showing the walk-around, add-on deck design very similar to those existing in the pools accused of infringement were completed in November, 1963, several months prior to Hall's conception date. The drawings in November, 1963, illustrated the horizontal aluminum bar connection between the basic vertical frame structure and the diagonal outriggers which extend upwardly and outwardly from the base of the pool. The deck sections were to rest on the horizontal aluminum bars. (November, 1963 drawings DX–29, 31; slightly later drawings DX–26, 40, 41).

A prototype pool with the add-on deck was built in the late summer of 1964 after the end of the normal pool selling season. The prototype was constructed in the back yard of defendant's plant manager, Mr. Dietrich, and was completed in September or October of 1964. In all respects here pertinent this prototype pool was the same as the pools accused of infringement.

The prototype pool with the add-on deck was tested during the following two winters and was offered to the trade in the fall of 1966.

Development and testing on the patio sun deck addition which had been first shown in primary form in a February, 1964 drawing (DX–23) was thereafter completed and it was offered to the trade in the fall of 1968. On occasion the add-on deck was purchased after the basic pool and added to the basic pool by the customer. Also the sun deck patio was purchased separately from the add-on deck by some customers and affixed to the basic pool frame.

## PRIOR ART

Plaintiff contends that the prior art swimming pools at the time of the inven-

Fiber, he submitted various swimming pool designs, including decking arrangements for their consideration. Some of his sketches and engineering drawings were received in evidence.

tion were of two basic types; (a) large wooden rectangular pools with decks and (b) circular pools generally known as "splashers". Rectangular pools with decks were made of conventional lumber such as that used in home construction. Wooden posts were normally placed down and bolted together with the posts on the outside being set in concrete. Plywood sheets were then placed along the sides of the pool with beams being placed on the four top edges. Decking for the rectangular pool was then placed on the top of the beams. These pools were built by carpenters; they were of strong construction and included substantial bracing.

The circular splasher pools were formed from a metal band which was unrolled, fastened together and set up within a metal frame to support the band until the water was placed in the pool. The majority of these pools were composed of a top rail and a bottom rail which were hooked at their ends so that they could go into uprights forming a frame around the band. The band was constructed of either steel, aluminum or wire mesh. A plastic liner would then be placed within the retaining band to hold the water so that the outward hydrostatic pressure would be absorbed by the retaining band.

It is plaintiffs' position that these circular pools were weak to such an extent that they sometimes tended to collapse prior to being filled with water. Also, they were supposedly very frail from the standpoint of securing anything, e. g., a deck to such pool. Plaintiffs cite as an example that when ladders were needed with this type of pool, A-frame ladders were used which went up one side and down into the pool free standing from the pool wall.

While agreeing that many prior art circular pools were flimsy, defendant successfully contradicted plaintiff by producing evidence that, in some existing designs, the frame structure surrounding the retaining band was of a substantial and sturdy nature. One manufacturer, Muskin Pools, included the following statement when advertising its pools:

"Bridge type construction"

"They will support a truck"

"Built like a bridge"

"The . . . Muskin 'Surf King' Family Swimming Pool easily supports a combined weight of 4,650 pounds— ample proof that Muskin Pools with heavy gauge steel structural members and bridge type construction offer superior strength for years of active use."

By December 1963 defendant's "Millionaire" basic pool had been introduced to the trade and included a sturdy frame structure. As previously mentioned, the frame structure of the pool was intended to permit the addition of a walk-around deck surrounding the pool as an add-on feature. Said frame structure (without the add-on deck) was substantially identical to the basic frame structure existing in the pools now accused of infringing the Hall patent.

The idea of placing a deck around above-ground pools was not new with Mr. Hall in 1964. This feature was embodied in rectangular pools such as were manufactured by International Swimming Pool Company (Exhibit DX–1), Lerner Patent 3,016,546 (DX–13); Preuss Design Patent 189,181, (Exhibit DX–12). In these rectangular pools the decking or walkways extended outwardly from the upper edge of the pool and were supported at their outer edge by diagonal supports secured to the base of the pool in a manner strikingly similar to plaintiff Hall's construction.

Hall was aware of the rectangular pool with surrounding decks and some of the earlier circular pools prior to the time of his work in 1964. Hall contends, however, that he was the first person to succeed in providing a deck surrounding a circular pool; he further contends that it would not have been obvious to secure an integral deck surrounding the flimsy circular splasher pools of the type familiar to him prior to 1964.

Although plaintiffs' expert, one Paul Pryor, also urged that, in his opinion, it would not have been obvious to attach a decking surrounding a flimsy splasher pool, he admitted that persons skilled in the art in 1964 would not have had any difficulty attaching a decking or walkway surrounding a cylindrical container, such as a municipal water tank or a cylindrical pool with a sturdy wall structure. Plaintiffs' expert also conceded that he had seen municipal water tanks with surrounding walkways for many years prior to Mr. Hall's work. He testified as follows (Tr.–116):

Q. Mr. Pryor, I believe at the close of yesterday's session you had testified that in your opinion it would not be obvious to take the walkway from a rectangular pool and put it on a circular pool because of the flimsy wall construction of the circular pool. Now, I would assume from this testimony that if you had a nice, solid cylindrical tank of some sort, say like a municipal water tank, a good solid boiler plate construction, that you could then have no difficulty attaching a walkway with diagonal supports to that tank? Would you agree with that?

A. I would agree, yes, sir.

Q. Have you ever seen these municipal water tanks that are up quite high with stairways going all up and walkways around?

A. Yes, I have.

Q. They would be of that type construction, or have been sometimes?

A. Yes, heavy construction.

Q. I would assume you would also agree that if we had a circular pool which had a rigid wall construction of some sort, that there would be no difficulty putting walkways and diagonal supports around that pool?

A. If it were strong enough, yes.

Apparently, the idea for defendant's deck came from the common municipal water tank structure since an early drawing of defendant's deck includes the note: "Deck, same idea as on water tank except water tank is round". Plaintiffs' expert also conceded that the Muskin Pools were of sturdy construction and were not flimsy splasher pools. (Tr.–123).

Q. Mr. Pryor, I show you Exhibit D–8 [Muskin's 1964 brochure] and ask you if you would agree that the pool illustrated there is not a flimsy circular pool?

A. From the diagram, I would say it isn't. It is a sturdy pool. I don't recall seeing many of them.

Q. I would also ask you to look at the various other illustrations of what they refer to as their bridge-type construction; it looks like some fairly solid beams running vertically. I show that for the various pools. Do you agree that this looks like a fairly sturdy construction?

A. Yes.

## VALIDITY

The initial issue to be determined in this action is the validity of the '926 patent.[2] 35 U.S.C. § 102 imposes the

2. The applicable statutes are:
35 U.S.C. § 101:
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
35 U.S.C. § 102:

A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this

condition of novelty on the patentability of an invention. In order for an invention to be patentable it must not have been disclosed in the prior art as defined by the statute. Section 103 imposes the requirement of invention in addition to novelty, i. e., the device need not have been exactly described in the prior art, however, it will not meet the statutory requirement of invention if the differences between the subject matter of the thing sought to be patented and the prior art are such that the subject matter would have been obvious at the time of the invention to a person having ordinary skill in the art to which the subject matter pertains.

In order to meet the statutory requirement of novelty, the invention must possess statutory newness as defined in 35 U.S.C. § 102. If an invention does not meet the requirements of Section 102, it is anticipated and cannot be valid. "Invention" is not to be confused with novelty and anticipation. A device may possess novelty but lack invention and thus be unpatentable by virtue of 35 U.S.C. § 103 which requires that a device to be patentable, although "new", must not have been obvious to one skilled in the art to which it pertains. Worthington v. Southern New Jersey Newspapers, Inc., 323 F.Supp. 443 (D.N.J. 1970). See also 1 Deller's Walker on Patents, 2d Ed. § 56.

■ ■ A threshold issue to be determined, therefore, is whether the '926

patent has been anticipated in the prior art so as to deprive it of novelty. Novelty does not exist if the patented device has been anticipated by a prior device, whether patented or not, i. e., novelty is lacking if *all* the elements of the patent, or their equivalents, are found in a single prior art structure where they do substantially the same work in the same way. A. J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357 (6th Cir. 1968). "To anticipate a combination, the combination in its entirety must be old." Bristol v. Otis Elevator Co., 52 F.2d 772, 773 (3rd Cir. 1931). The fact that each element of the device sought to be patented is found in the prior art does not necessarily negate novelty. Shaw v. E. B. & A. C. Whiting Co., 417 F.2d 1097 (2nd Cir. 1969), cert. denied, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970), rehearing denied, 398 U.S. 954, 90 S.Ct. 1866, 26 L.Ed.2d 298 (1970).

■ No prior art reference has been introduced which is identical or substantially equivalent to the '926 patent. Although evidence was introduced which indicated that the salesman, Sikorski, had submitted very rough drawings to U. S. Fiber of integral decking arrangements just prior to plaintiff Hall's proposed conception date, such designs would not constitute anticipation of the Hall patent. In order to anticipate, a prior device, though it does not have to be patented, it must have been reduced to use

or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 282:

A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it . . . .

and successfully performed. Furthermore, the use must have been public, although it need not have been a commercial use. Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406 (6th Cir. 1964), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L. Ed.2d 93 (1964). The '926 patent, therefore, has not been anticipated in the prior art and meets the requirement of novelty imposed by 35 U.S.C. § 102.

■ There is no question that the invention has utility. A swimming pool with a deck is a useful device and, therefore, fulfills the statutory requirements of utility, 35 U.S.C. § 101.

■ ■ The next consideration is the requirement of "invention" as set forth in 35 U.S.C. § 103. Obviousness, unlike anticipation, can be shown by combining elements of several prior art structures; it is not necessary to find all the elements in one prior reference. Sperti Products, Inc. v. Coca Cola Co., 399 F. 2d 607 (3rd Cir. 1968); Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912 (3rd Cir. 1966).

The question of whether the invention was unobvious at the time it was made is determined in accordance with the rationale set forth in United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) and Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). As set forth in 383 U.S. 17, 86 S.Ct. 694 in Graham v. John Deere:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

The scope and content of the prior art relative to the Hall patent, aside from Sikorski's work, included the following:

First, circular above-ground pools with a continuous water retaining band and plastic liner were in existence for many years. Furthermore, pools with substantial wall structure for supporting a railing, and capable of supporting a surrounding deck were in existence and on the market prior to Hall's conception date. Additionally, above-ground pools including decks extending outwardly from the upper edge of the pool and supported by diagonal outriggers extending from the outer edge of the deck to the base of the pool were in existence for many years prior to Hall's work. These prior art pools with decks were of a rectangular configuration. Finally, for many years prior to Hall's work, walkways or decks had been placed surrounding circular structures such as municipal water tanks in which the deck would extend outwardly from the tank and be supported at its outer edge by diagonal supports connected to the base or wall of the tank.

■ The difference between Hall's work and the prior art (again excluding the work of Mr. Sikorski) is that the deck structure of the rectangular pools or circular municipal water tanks had not been placed surrounding the circular swimming pool or attached to the substantial wall structure of the existing swimming pools. The level of ordinary skill in the art, in this case, can be determined from the admissions of plaintiff's expert where he conceded that a person skilled in his art would have no difficulty attaching a walkway of the type found in the rectangular pools or in the municipal water tanks to a cylindrical pool provided the existing wall structure was sufficiently strong. In the case of defendant's pools accused of infringement, the deck was in fact secured as an add-on feature to a pool

wall structure which was in existence prior to Hall's conception date. Accordingly, it was obvious in 1964 to attach the deck surrounding the rigid wall structure of previously existing pools and hence, claims 11, 12 and 15 of the Hall patent are invalid as obvious under 35 U.S.C. § 103. Where a device involves no more than ordinary mechanical skill, it does not rise to the dignity of an invention. Tingue, Brown & Co. v. Raybestos-Manhattan, Inc., 181 F.Supp. 134 (D.N.J.1960), aff'd. 283 F.2d 694 (3rd Cir. 1960).

The presumption of validity properly accorded a patent pursuant to 35 U.S.C. § 282 has been effectively rebutted in this action.

> "While the patent grant by the Patent Office still gives rise to a presumption of validity, the effective force of that presumption has been substantially weakened by *the plethora of decisions recognizing 'the notorious difference' between the loose standards applied by patent examiners in approving patented unpatentables, and the standards applied by the courts in dispatching them.* Graham v. John Deere Co., supra, 383 U.S. at 18, 86 S.Ct. 684; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., supra, 340 U.S. at 156, 71 S.Ct. 127 (Mr. Justice Douglas concurring); Packwood v. Briggs & Stratton Corp., 195 F.2d 971, 974 (3rd Cir. 1952)." Atlas Copco Aktiebolag v. Ingersoll-Rand Co., 279 F.Supp. 783 (D.N.J.1967). (Emphasis added.)

Moreover, the presumption of validity in this case is further weakened as a result of the circumstances surrounding the introduction of the late claims. The allegedly infringed claims 11, 12 and 15, conceivably the only claims which could cover defendant's pools since they are not limited to a double-walled structure, were not introduced by amendment in the United States Patent Office until November, 1966. There were several contacts between applicant's patent agents and the Patent Office Examiner without any summary of the discussion being set forth in the file history as is required by Rule 133 of the Patent Office Rules of Practice, even though it was at this time that a substantial shift in the patent protection being sought was made, that is, a shift from the rather limited coverage of a double-walled pool structure to the much broader coverage of a pool with one or more walls.

This amendment was more than two years after the reduction to practice of defendant's pool structure in October, 1964, and perhaps after the introduction of defendant's pool to the commercial market in 1966.

## INFRINGEMENT

The finding of invalidity disposes of this litigation. Nevertheless, it has been felt to be preferable for the district court to make findings on the issue of infringement so that, in the event of reversal on validity, a remand for determination of the issue of infringement will not be necessary. See Frank W. Egan & Co. v. Modern Plastic Machinery Corp., 387 F.2d 319 (3rd Cir. 1968).

Infringement is the unauthorized making, use, or sale of any patented invention within the United States within the term of the patent. 35 U.S.C. § 271. In order for there to be infringement, the substance of the invention disclosed and claimed in the patent must be incorporated in the units accused of infringing the patent. To infringe, a device must perform " . . substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). See also Q-Tips, Inc. v. Johnson & Johnson, 207 F.2d 509, 511 (3rd Cir. 1953), cert. denied, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954).

Plaintiffs' position at trial is that the Hall concept involves placing the circular decking of the pool in tension. The patent claims do not mention "ten-

sion" rings surrounding the pool but plaintiffs urge that normal interpretation would require reading this limitation into the claims. In this regard, plaintiffs' patent expert testified as follows:

Q. Well, could you refer to anything specifically in Claim 11 which leads you to believe that? [That Claim 11 calls for, and is limited to, an arrangement in which there is tension ring action.] I am sure that you are not just telling it because it is your opinion, there must be some basis in the claim, isn't there?

A. Yes, there is. Let me explain it this way: Of course, the word or words, tension, does not appear in the claim, you are quite correct, if that is what you mean. However, it is axiomatic in the interpretation of claims that you don't interpret the claims in a vacuum, you interpret them in light of the specification. Now, when you read the specification of this patent you find time and time again references to tension ring.

Furthermore, the patent statute, Title 35, in Section 112, says that an element in a claim may be recited as a means, plus a function, and that that means shall be construed to cover the disclosed structure and equivalents thereof. Well, in view of those two factors that I just described to you, I feel that this claim implicitly and necessarily calls for and is restricted to an arrangement in which you do have this tension ring action

Q. Are you telling me, then, that when the claim says a base template ring it just doesn't mean any base template ring, it means one that is a tension ring?

A. Yes, that is what I mean.

Q. When the claim refers to an upper template ring, that the same is true?

A. Yes, using the ordinary rules of claim interpretation.

According to plaintiffs, their circular decking is normally not in tension when the pool is empty, but when the pool is filled with water, the outward pressure of the water forces the decking into tension so as to provide rigidity of the decking. When the upper walkway or decking around the pool is in tension, it allegedly becomes rigid and no longer wobbles. During the course of the trial, plaintiffs' counsel stipulated on the record that if the circular decking surrounding defendant's pool did not go into tension when the pool was filled with water there would be no infringement of the patent in suit:

MR. LERNER: . . . I think we have to assume once more that would be infringed if when you fill it up with water it did press to create tension. You can't tell from the drawing.

MR. EWERT: Does that mean that if it doesn't go into tension it is not an infringement?

MR. DAVID: Not an infringement, exactly.

MR. EWERT: I guess that is a stipulation on the record?

MR. DAVID: That is correct.

Plaintiffs' expert, a structural engineer, testified that he had examined one of the defendant's pools and felt certain that the deck would be placed in tension when the pool was filled with water. However, his only examination of defendant's pool was at a time when the pool was empty. Accordingly, this testimony as to what would happen when the pool is full of water is somewhat speculative.

Defendant, however, introduced credible evidence showing that with its design the frame and deck surrounding the

water retaining band is not in tension when the pool is full of water, and, further, that defendant's pool was intentionally designed to avoid tension in the frame and deck surrounding the pool. In the normal pool assembly, according to defendant's instruction manual, a continuous aluminum retaining band is first set on a level surface in as close to a circular configuration as is possible. An extruded aluminum frame is then loosely assembled surrounding the retaining band. About four (4) inches of water are then put into the plastic pool liner within the retaining band to push the band into the hydrostatically preferred circular configuration. The loosely assembled frame moves to accommodate the preferred circular configuration caused by the water pressure and the frame is thereafter tightened up.

To further illustrate that the water does not exert forces creating tension in the frame and deck, plaintiffs introduced a series of photographs showing the assembly of one of their pools starting with the water retaining band completely filled with water. These photographs showed that the continuous aluminum retaining band alone (with plastic liner inside) retains the water and provides a pool sufficiently rigid to permit swimming therein. In one of the earlier pools, defendant found that the retaining band was sometimes inadvertently made larger than intended and apparently placed the structure surrounding the base of the pool in tension when the pool was filled with water. The structure surrounding the base of the pool was incapable of withstanding the tension forces and broke apart. To eliminate this problem the ring was redesigned to provide up to nine (9) inches of circumferential expansion so that the ring surrounding the base of the pool, rather than going into tension under these conditions, would simply expand, i. e., be pushed aside to accommodate the retaining band.

The decking and frame portions surrounding the upper portion of the pool are likewise designed to permit variations in the retaining band dimensions to avoid placing this part of the structure in tension. The upper portion of the surrounding structure is not secured to the retaining band but, instead, is designed to permit several inches of radial play so that the band can freely move relative to the frame. Photographs taken in 1964 of defendant's original prototype pool show that an actual space exists between the water retaining band and the surrounding frame structure. Hence, at least in some places, the water retaining band is not in contact with the surrounding frame and therefore, the outward pressure of the water within the band could not be transmitted into the frame and deck to place them in tension, thus forming tension rings. More recent photographs show defendant's plant manager with his hand between the water retaining band and the surrounding structure to illustrate the same point.

The court also heard testimony supported by various photographs indicating that in defendant's pools the deck structure is rigid even though some sections of the decking are removed (that is, sections which would be required in forming the alleged tension rings) and that there is not a significant difference in rigidity of the decking structure when the pool is full as compared to when it is empty.

An examination of the exhibits depicting defendant's frame structure for the deck pool shows that it is supported not by any tension ring or by the water retaining means whether full or empty, but by the pressure exerted upon the ground by the vertical uprights and their lower horizontal outriggers bearing upon the wooden base blocks inserted beneath the outriggers and by the internal rigidity of the frame's members. These can be clearly seen in the defendant's Instruction Guide.

As discussed previously, plaintiffs' position throughout the trial has been that the basic concept embodied in the claimed invention requires the deck and

other structure surrounding the water retaining band to be in tension. Plaintiffs have stipulated that if the deck and the surrounding structure are not in tension when the pool is full of water, then there is no infringement. A careful review of the evidence has led this Court to conclude that the deck and the surrounding structure in defendant's pools do not employ the tension ring principle; therefore, there is no infringement of the patent in suit.

An appropriate order consistent herewith for entry of judgment in favor of defendant and against plaintiffs with prejudice and without costs will be submitted.