Eugene A. WAHL and Vibra Screw,
Incorporated, Plaintiffs,

v.

REXNORD, INC., Defendant.

Civ. A. No. 76–791.

United States District Court,
D. New Jersey.

Jan. 25, 1979.

On Motion for Reconsideration
May 25, 1979.

Freiden, Kirsten, Friedman & Cherin by Harold Friedman, Newark, N. J., and Ferrill & Logan by John W. Logan, Jr., and Robt. P. Seitter, Fort Washington, Pa., for plaintiffs.

Gaccione, Pomaco, Patton & Beck by John E. Patton, Belleville, N. J., and McWilliams & Mann by Thomas F. McWilliams, Chicago, Ill., for defendant.

## OPINION

MEANOR, District Judge.

This is an action asserting infringement of United States Patents No. 3,261,508

("508 Patent") and No. 3,173,583 ("583 Patent") and for an accounting for profits and damages arising therefrom.

Plaintiffs are Eugene A. Wahl and Vibra Screw, Inc. Wahl is president of Vibra Screw, Inc. and owner and patentee of the '583 Patent issued March 16, 1965 and the '508 Patent issued July 19, 1966. (Complaint ¶ 5.) Vibra Screw, Inc. is a corporation of New Jersey and is the exclusive United States licensee under the two patents. (Complaint ¶ 5; Admitted in ¶ 5 of the Answer.) By virtue of such licensee arrangement, it is alleged and uncontested that Wahl is receiving a royalty from Vibra Screw of 2½% of the net sales price of all patented devices sold by Vibra Screw.

Defendant Rexnord, Inc. is a corporation of Wisconsin.

Wahl charges, *inter alia*, that Rexnord, Inc. is making, using and offering for sale vibratory bin activators embodying the inventions described and claimed in the '508 and '583 Patents.[1] Rexnord counterclaimed for recovery of damages and other appropriate relief on account of alleged antitrust violations pursuant to 15 U.S.C. §§ 1 and 2. Defendant maintains that plaintiffs filed patent infringement claims in Idaho for no other purpose but to harass Rexnord and potential customers thereof in the sale of vibrating bin bottoms. Furthermore, defendant contends that Wahl and Vibra Screw engaged in a conspiracy in restraint of trade via the maintenance of unfounded patent infringement litigation, thereby promoting the sale of Wahl's bin activators and discouraging prospective purchasers from buying such equipment from others.

Wahl, on May 2, 1978, in response to Rexnord's counterclaims, moved for summary judgment with respect to the Sherman Act, §§ 1 and 2 violations. Rexnord

responded with a summary judgment motion seeking a ruling that there was no patent infringement of the '508 patent 'by the Rexnord vibratory bin activator. Rexnord asserts that there was double patenting between the '508 Patent and Wahl's design Patent No. 202,068 ("068 Patent"), thereby invalidating the '508 Patent. Finally, Wahl moved for a summary judgment to the effect that the '508 Patent was not invalid for double patenting.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338 and venue is proper in this court under 28 U.S.C. § 1400(b).

## I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE ISSUE OF DOUBLE PATENTING IS GRANTED.

The defendant, Rexnord, argues that the '508 utility patent is invalid for double patenting in view of the '068 design patent. The material-receiving member of the bin *promoter* as shown in the design patent is the same as that shown in the '508 Patent. *See* diagrams of the '068 and '508 Patents, *infra*. Plaintiffs, on the other hand, maintain that the design patent does not show the internal configuration of the material-receiving member, and, therefore, it is inappropriate to conclude that the bin activator of the '068 design patent has a plurality of concave surfaces as called for by the claims of the '508 utility patent.

Patent '068 is a design patent and claims "the ornamental design for a storage bin flow promotor as shown and described." Such patent was issued on August 24, 1965 for a period of 14 years. Its exclusive licensee is plaintiff, Vibra Screw, Inc. The '068 design patent includes the following diagrams: [2]

---

1. This court, on May 19, 1977, entered an order for partial summary judgment dismissing the complaint insofar as it charged infringement of Patent No. 3,173,583.

2. The bin flow promoter is described as follows: Figure 1 is a front, elevational view of a

storage bin flow promoter. Figure 2 is a side, elevational view. Figure 3 is a top plan view. The dominant features of the design reside in the portions, shown in full lines. And the bottom of the cylindrical projection on the bottom of the promoter has a conventional cylindrical opening.

# United States Patent Office

Des. 202,068
Patented Aug. 24, 1965

202,068

STORAGE BIN FLOW PROMOTER

Eugene A. Wahl, 294 Forest Ave., Glen Ridge, N.J.

Filed Nov. 27, 1963, Ser. No. 77,588

Term of patent 14 years

(Cl. D55—1)

Fig-1

Fig-2

Fig-3

The utility '508 Patent was subsequently issued to Eugene Wahl on July 19, 1966 for a term of 17 years. Its exclusive licensee is also Vibra Screw, Inc. The '508 Patent claims a vibratory storage bin activator apparatus with the emphasis primarily on the internal configuration of the interior surfaces and on the means for vibrating the material.[3] In particular, the claims of the '508 Patent call for a plurality of concave surfaces for the bottom walls of the bin activator in order to promote the flow of material from the storage bin and to arrange for effecting a positive discharge

3. Claim 1 of the Utility patent, see Appendix B, is representative:

1. Apparatus for promoting the flow of material from a storage hopper having a discharge opening formed in the bottom thereof, said apparatus comprising:

(a) a material-receiving member having a bottom wall defined by a plurality of concave surfaces terminating in a central outlet opening,

(b) means vibrationally suspending the material-receiving member from the hopper and in spaced position to the hopper wall, and

(c) means for vibrating the material-receiving member.

of the material though an outlet opening. Such flow is insured via the vigorous vibrations of the gyrator at the bottom of the bin which agitates fibrous, sticky material, e. g., wet sand, clay, wood chips, etc., having the tendency to interrupt the continuous discharge of material from the storage bin. The utility patent includes the following diagrams:

July 19, 1966 E. A. WAHL 3,261,508

VIBRATORY BIN ACTIVATOR

Filed Jan. 24, 1964 3 Sheets-Sheet 1

FIG-1

FIG-2

EUGENE A. WAHL
INVENTOR

BY

Rudolph J. Juick
ATTORNEY

*FIG-3*

EUGENE A. WAHL
INVENTOR

BY

*ATTORNEY*

July 19, 1966 E. A. WAHL 3,261,508

VIBRATORY BIN ACTIVATOR

Filed Jan. 24, 1964 3 Sheets-Sheet 3

EUGENE A. WAHL
INVENTOR.

BY

*Rudolph J. Jurick*

ATTORNEY

Under the judicially created doctrine of double patenting, a prior design patent can invalidate a latter issued utility patent. See *Application of Thorington*, 418 F.2d 528, 57 C.C.P.A. 759 (1969), *cert. denied*, 397 U.S. 1038, 90 S.Ct. 1356, 25 L.Ed.2d 649 (1970). The doctrine was created to prevent the extension, beyond its lawful limits, of the patent monopoly. See *J. R. Clark Co. v. Jones & Laughlin Steel Corp.*, 288 F.2d 279 (7th Cir.), *cert. denied*, 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed.2d 32 (1961). The patent laws, of course, provide that a design patent and a utility patent may well be issued on the same construction. See 35 U.S.C. § 101 (utility), § 171 (design).[4] However, each such patent must claim a separate, distinct patentable invention. *Ropat Corp. v. McGraw-Edison Co.*, 535 F.2d 378 (7th Cir. 1976); *In re Barber*, 81 F.2d 231 (Cust. & Pat.App.1936). More specifically, in the words of the Supreme Court, the later patent "must be something substantially different from that comprehended in the first patent. It must consist in something more than a mere distinction of the breadth or scope of the claims of each patent." *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 198, 14 S.Ct. 310, 315, 38 L.Ed. 121 (1894).

The *Ropat* court, in particular, had occasion to deal with such a situation. There, the first-to-issue design patent claimed an ornamental design for a corn popper. The utility patent called for a corn popper primarily composed of a base and heating element. The dome cover was described as possessing a volume substantially greater than that of the pan so that the corn rises and fills as it is popped. Patentee Ropat brought suit against various defendants for infringement of the utility patent. The defendants raised the defense of "double patenting" and moved for summary judgment, arguing that both patents claimed the same invention and that the utility patent invention was inherently in the design patent.

The Seventh Circuit pointed out that when a double patenting situation involves a design and utility patent, it is not easy to compare utility word claims with design picture claims in determining whether the same invention is claimed. The mere use of the same design claimed in the design patent as the vehicle for describing the utility claimed in the utility patent is not dispositive when comparing such claims. 535 F.2d at 381; *Anchor Hocking Corp. v. Eyelet Specialty Co.*, 377 F.Supp. 98, 101 (D.Del. 1974). The pertinent test, therefore, for determining whether the utility and design patent claim the same invention was set forth as follows:

> . . . [D]ouble patenting exists if the feature in which the novel esthetic effect resides is the identical feature which produces the novel function so that a structure embodying the mechanical invention would of necessity embody the design, and vice versa.

535 F.2d at 381. See *In re Hargraves*, 53 F.2d 900 (Cust. & Pat.App.1931); *Application of DuBois*, 262 F.2d 88, 46 C.C.P.A. 744 (1958).

Thereupon, the *Ropat* court held that the "novel feature" constituting the design claimed in the design for the popcorn popper is the large flattop dome cover, the volume of which is greater than that of the cooking pan in the base. This novel design feature clearly produces the novel "pop-flip-serve" function which forms the essence of the utility patent claim. The patentee in *Ropat* insisted that the district court read into the design patent a feature not claimed or described, namely, a shallow cooking pan in the base. Since neither the cooking vessel nor its volume were claimed or disclosed in the design patent, one would not know

---

4. § 101. Inventions patentable

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

§ 171. Patents for designs

Whoever invents any new, original and ornamental design for an article or manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

. . . .

whether the volume of the dome was greater than the cooking vessel. However, Judge Castle pointed out that a design patent and a utility patent need not claim every incidental feature of the other in order for both to claim the "same invention." Moreover, he stated:

A design patent is granted pursuant to 35 U.S.C. § 171 on an *article of manufacture* as well as for a distinctive design. Being a corn popper, the article of manufacture present in the design patent here must necessarily possess a cooking vessel and heating element in its base. . . . Regardless of the exact volume of the cooking pan in the popper claimed in the design patent, it readily appears from the design patent that its volume necessarily would be less than that of the dome.

535 F.2d at 382. (Emphasis supplied; citation omitted.) The Seventh Circuit thereupon found that a person following the design patent would clearly infringe Ropat's utility patent since it would be capable of functioning in the precise manner as claimed in the design patent and held the utility patent invalid for double patenting.

In the instant case, patentee Wahl argues that the two conditions of the relevant test as set forth by the *Ropat* court in order to find double patenting have not been met. First, a structure made in accordance with the claims of the utility patent must "of necessity" embody the claim of the design patent and, secondly, a structure made in accordance with the claim of the design patent must "of necessity" embody the claims of the mechanical patent. The Wahl design patent is directed solely to an ornamental exterior surface configuration of a flow promotion device, while the utility patent is directed to a combination of elements including a claimed interior surface configuration of a bin discharging device. The interior surfaces of the material-receiving member of the design patent cannot be seen on the design drawing. The internal configuration, Wahl insists, is not part of the design patent claim. In order to read the utility patent claims on the apparatus illustrated in the design patent drawing, it must be assumed that the internal wall configuration of a structure made in accordance with the design patent drawing follows the external wall configuration. The affidavit of patent expert Elliot makes clear that a bin discharging device embodying the exterior surface configuration of the design patent could include interior surface configuration other than the plurality of concave surfaces claimed in the utility patent. (Elliot affidavit, exhibits II, III.) Accordingly, a structure embodying the design invention does not "of necessity" embody the utility invention and, thus, there is no double patenting.

Wahl's contentions are unpersuasive. He misconstrues the test set forth by the Seventh Circuit in *Ropat* by stretching the common sense meaning of the phrase "of necessity." That court set forth two conditions, either of which satisfies its test for double patenting.[5] The issue, therefore, be-

5. The Seventh Circuit reviewed the various lines of cases setting forth independent tests of double patenting in the design-utility situation. In particular, certain courts apply the general rule that double patenting exists if the design claimed in the first-to-issue design patent cannot be employed without infringing the utility patent. *See Application of Thorington, supra,* 418 F.2d at 537; *Illinois Tool Works, Inc. v. Solo Cup Co.,* 179 U.S.P.Q. 322, 368 (N.D.Ill. 1973); *Tractor Supply Co. v. International Harvester Co.,* 155 U.S.P.Q. 420 (N.D.Ill.1967); *Deller's Walker on Patents* 70 (2d Ed. 1969—70 Cum.Supp.). Other courts apply the rule that double patenting has not occurred if the second-to-issue utility patent encompasses designs other than the design claimed in the first-to-issue design patent. *See Application of*

*Swett,* 451 F.2d 631, 59 C.C.P.A. 726 (1971); *Mr. Hanger, Inc. v. Cut Rate Plastic Hangers, Inc.,* 372 F.Supp. 88 (E.D.N.Y.1974). A third "test" for "same invention" double patenting is whether one of the claims being compared could be literally infringed without literally infringing the other; if it could be, the claims do not define identical subject matter. *See Application of Vogel,* 422 F.2d 438, 57 C.C.P.A. 920 (1970); *Application of Avery,* 518 F.2d 1228 (Cust. & Pat.App.1975). Accordingly, the Seventh Circuit concluded that such tests merely constitute corollaries and can only be properly applied with reference to the basic standard enunciated in *Hargraves* and *DuBois.*

This court concurs in such analysis and believes that the best formulation of the applicable standard is that as set forth in *Ropat.*

comes whether the features in which the novel esthetic effect resides are the identical features which produce the novel function claimed in the utility patent.

The novel features of the design patent are the outside proportions and the exterior configuration thereof, which produce a plurality of convex exterior surfaces for the bottom walls of the storage bin promoter. This novel design feature clearly produces the novel interior configuration which forms surfaces of the dish-shaped sides, resulting in a positive discharge of material through the outlet when the gyrator is operating, while at the same time preventing discharge of material when the gyrator is not operating. Such construction facilitates the movement of material down from the upper regions of the storage bin and alleviates the congestion and packing of material at the bin discharge opening, thereby assuring a positive and uniform flow. Wahl insists, however, that all the elements recited in the utility patent claims are not found in the structure of the design patent. This argument is unpersuasive. Double patenting in the design-utility situation cannot turn on the niceties of precise ornamentation, *see e. g., Application of Du- Bois, supra,* 262 F.2d at 90–91, 46 C.C.P.A. 744, but rather must turn on the presence or absence of design features which produce the novel function claimed in the utility patent. As the *Ropat* court pointed out, "[a] design patent and a utility patent need not claim every incidental feature of the other in order to claim the 'same invention.' " 535 F.2d at 382. Moreover, 35 U.S.C. § 171 authorizes the patenting of a design patent on an article of manufacture, *e. g.,* a storage bin promoter, and not just on appearance. *See Application of Thorington, supra,* 418 F.2d at 537.

In *Thorington,* for example, the U.S. Court of Customs and Patent Appeals found double patenting of a fluorescent lamp even though the patentee argued that the design patent protected only ornamental design, while the claims of the utility patent were directed to the exact structure and function of the lamp. Such claims re- quired the cooperation of certain elements, namely, an electrode, a phosphor coating, an ionizable medium and starting gas, and an envelope of vitreous material, not shown or covered by the design patent. The court rejected the argument. The design patent protected an article of manufacture, e. g., a fluorescent lamp, embodying the ornamental configuration under 35 U.S.C. § 171. Thereupon, the court did not find the difference between the two patents significant and accepted the principle that double patenting is a proper ground for rejection where the features producing the novel aesthetic effect of a design patent are the same as those recited in the claims of a utility patent. Accordingly, the pertinent claims of the utility patent were held invalid.

The same principal was recently enunciated in *Transmatic Inc. v. Gulton Industries, Inc.,* 442 F.Supp. 911 (E.D.Mich.1977). The design patent in question set forth that the dominant features of the design, *i. e.,* an ornamental design for a lighting fixture, reside in the portions shown in full lines. The lens portion was shown in full lines while the lighting source and reflector were shown in dotted lines. On this basis, the patentee asserted that the invention claimed in the design patent was, therefore, only the lens feature. The invention claimed in the utility patent, on the other hand, was the lighting fixture as a whole, including the positioning of the light source and the shape of the reflector surface. The court was unpersuaded and noted, in accordance with *Ropat,* that the claim in a design patent is on an article of manufacture, here a lighting fixture. Judge Kennedy found that the claim in the design patent was for a lighting fixture and included the entire drawing, at least to the extent of a light source and a reflecting back. Thereupon, the court held the utility patent invalid for double patenting.

In the instant case, the design patent only sets forth an outer appearance apart from the detail of the bin's function and structure which is set forth in the utility patent. This difference is not signifi-

cant. The design patent protects an article of manufacture, here a bin discharging device, embodying the ornamental configuration. 35 U.S.C. § 171. Such bin has a well defined meaning which necessarily includes those elements recited in the '508 Patent. In particular, the article of manufacture present in the design patent must necessarily possess a sloping interior configuration, i. e., a plurality of concave surfaces forming downward-sloping dish-shaped sides in order to assure a positive flow and uniform discharge of material. Once the design patent expires, the public should be free to construct bin discharging devices without restraint by the claims of the utility patent.

Although Wahl argues that a bin discharging device embodying the exterior surface configuration of the design patent could include an interior configuration other than the plurality of concave surfaces claimed in the utility patent, this court notes that this appears to be an unrealistically strained effort to produce a bin that conforms to the illustration in the '068 Patent but not to the '508 Patent. The hypothetical interior configurations set forth in the Elliot affidavit are not commercially feasible in view of the function of an efficient storage bin discharging device, i. e., to assure a positive and uniform flow of material (Elliot affidavit, exhibits II, III). From a practical standpoint, it is clear that a person following the design patent as shown in the drawings would clearly infringe the utility patent since one manufacturing a bin discharging device following the drawing of the design patent would have a bin capable of functioning in the precise manner claimed in the utility patent, unless extraordinary and unnecessary steps were taken to see to it that the interior configuration did not parallel the exterior surface.

6. Wahl's vibratory bin activator is specifically described in the '508 Patent as follows:

Apparatus for attachment to the bottom of a storage bin having a discharge opening at the bottom, which apparatus comprises material-receiving means having concave side walls terminating in an outlet opening.

Accordingly, under the mandate of *Ropat* and *Thorington*, since the novel design feature claimed in the first-to-issue design patent produces the novel function claimed in the later-issued utility patent, utility Patent No. 3,261,508 is invalid due to double patenting over design Patent No. 202,068. The summary judgment motion is hereby granted.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF NON–INFRINGEMENT IS DENIED.

Rexnord strenuously argues that claims 1 through 4 of the Wahl '508 Patent cannot be read upon the Rexnord device. Such claims all call for "a plurality of concave surfaces" on the material-receiving member.[6] The Rexnord bin activator, on the other hand, does not have a "plurality of concave surfaces." The bottom wall of defendant's bin activator consists of two cones welded together and having planar surfaces, cones being of slightly different degrees of slope. Since there are not concave surfaces in Rexnord's structure, there can be no infringement. *See* Diagrams of the Rexnord Bin Activator, *infra*, attached hereto as Appendix A.

Wahl maintains that there is disagreement as to the nature of the surface in the Rexnord device. In particular, defendant's expert, Fischer, contends that the term "concave" by definition is limited to accurate surfaces, not including cones. (Fischer Deposition pp. 26, 27) Defendant's engineer Schrader describes the exterior concave surfaces of defendant's structure as being convex when viewed from the outside and concave when viewed from the inside. (*See* Plaintiff's Exhibit 17 attached to transcript of the Schrader Deposition set forth in the Hubley Affidavit filed Sept. 1, 1978.)

(Specifications, Col. 2, Lines 5–8.) Furthermore, it is set forth that the "apparatus comprises a bottom wall formed of a plurality of concentrically-arranged concave members leading to an output opening." (Specifications, Col. 2, Lines 15–17.) *See* United States Patent No. 3,261,508, *infra*, attached hereto as Appendix B.

However, plaintiffs' expert, Hubley, a mathematician for 31 years, clearly disagrees with Fischer's statement that the "definition that a concave surface is a surface not generated by a straight line" is "in every analytical geometry book I've ever seen." (Fischer Deposition p. 26.) After reviewing 26 such textbooks, Hubley did not find one containing the definition as Fischer so ascribed. Hubley, thereupon, asserted that since the interior of a cone is by nature concave, it would have been a gross inaccuracy for any analytical geometry textbook to present such a definition as Fischer's. (Second Hubley Affidavit p. 2.) Accordingly, Wahl concludes that there is a genuine dispute of fact as to the nature of the surfaces of defendant's structure. .

■ This court recognizes that in order for there to be infringement, the substance of the invention disclosed and claimed in the patent must be incorporated in the units accused of infringing the ˙patent. *Hall v. U. S. Fiber Plastics Corp.*, 341 F.Supp. 978, 986 (D.N.J.1971), *appeal dismissed as moot*, 476 F.2d 418 (3d Cir. 1973). To infringe, the accused device must be substantially identical in structure, mode of operation, and results accomplished as the device covered by the patent. *Baut v. Pethick Construction Co.*, 262 F.Supp. 350 (M.D.Pa.1966). In applying this general test of infringement, courts follow a two-step analysis. First, does the accused device literally infringe the patent in question? If not, then second, does the "doctrine of equivalents" nevertheless lead to a finding of infringement? *See Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co.*, 169 F.Supp. 1, 9 (E.D.Pa.1958), *aff'd*, 268 F.2d 395 (3d Cir.), *cert. denied*, 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959); *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

■ First, to determine what the patented invention is, we must turn to the claims of the patent because the scope of every patent is limited to the invention described in the claims, read in the light of the specifications.[7] *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917). If the accused matter falls clearly within the claim, infringement is made out and that is the end of it. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

■ Secondly, if patents, however, were interpreted only by the literal scope of their claims, minor deviations in the structure of almost any invention could be devised to elude the reach of the patent's protection. Thus, experience with patent cases demonstrates that seldom may the question of infringement be determined on the literal words of the claim. *See Fischer & Porter Co. v. Huskett*, 354 F.Supp. 464, 479 (E.D.Pa.1973); *Phillips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.*, 311 F.Supp. 17, 40 (D.N.J.1970), *aff'd*, 450 F.2d 1164 (3d Cir. 1971); *Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co.*, 194 F.2d 945 (7th Cir. 1952). In other words, patent infringement is not a matter of mere words nor does it depend on the mere application of claim phraseology. *See Elgen Mfg. Co. v. Ventfabrics, Inc.*, 207 F.Supp. 240, 252 (M.D.Pa.1966). In applying this general 1963). In recognition of the fact that a patent would be virtually worthless if it did not protect against devices which incorporate unimportant variations of the patented device, courts developed the "doctrine of equivalents" to protect the patentee from devices that differ merely in name, form or shape from the patented invention, *Machine Co. v. Murphy*, 97 U.S. 120, 125, 24 L.Ed. 935 (1877), but perform substantially the same function in substantially the same

---

7. It should be pointed out in this regard that it is well settled that the claims delineate the scope of protection afforded by a patent, not the spec-embodiments shown in the patent drawings. Deller's *Walker on Patents* § 509 (2d ed. 1972); *Panduit Corp. v. Stahlin Bros.*

*Fibre Works, Inc.*, 298 F.Supp. 435 (W.D.Mich. 1969), *aff'd*, 430 F.2d 221 (6th Cir. 1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1971); *Smith v. Snow*, 294 U.S. 1, 16, 55 S.Ct. 279, 79 L.Ed. 721 (1934).

way to obtain the same result.[8] *Graver, supra,* 339 U.S. at 608, 70 S.Ct. 854; *Burgess Cellulose Co. v. Wood Flong Corp.,* 431 F.2d 505, 507 (2d Cir. 1970); Deller's *Walker on Patents, supra,* § 546.

 To establish equivalency for the purpose of showing infringement of a patent claim, the patentee has the burden of proving a real identity of means, operation, and result. *Foster Cathead Co. v. Hasha,* 382 F.2d 761, 765 (5th Cir. 1967), *cert. denied,* 390 U.S. 906, 88 S.Ct. 819, 19 L.Ed.2d 872 (1968), citing C. Pigott, *Equivalents in Reverse,* 43 Journal of the Patent Office Society 291–92 (1966). But while substantial identity of function, operation, and result are necessary, the doctrine

> "does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents."

*Graver, supra,* 339 U.S. at 609, 70 S.Ct. at 857. Hence, minor variations between the accused structure and the precise language of the claims in question do not prevent a holding of infringement.[9] *See Graver, supra; Tokyo Shibura Elec. Co. Ltd. v. Zenith Radio Corp.,* 404 F.Supp. 547, 572 (D.Del. 1975), *aff'd,* 548 F.2d 88 (3d Cir. 1977); *Samuelson v. Bethlehem Steel Co.,* 323 F.2d 944 (5th Cir. 1963), *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

 Given the teaching of *Walker on Patents* and of *Graver,* this court holds that summary disposition is not appropriate. First, there is a genuine issue of fact whether or not Rexnord's vibratory bin infringes upon Wahl's, *i. e.,* plaintiffs' and defendant's experts disagree over the correct definition of the term "concave." Secondly, the issue of equivalency here is too close a call. The Rexnord bin activator "performs substantially the same function in substantially the same way to obtain the same result" as the Wahl vibratory bin activator, differing only in "name, form, and shape." *Graver, supra,* 339 U.S. at 608, 70 S.Ct. 854. Moreover, a finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of the evidence. This is especially true in patent cases where courts generally are unfamiliar with technical factual issues raised and must rely on expert testimony to resolve fact questions. Accordingly, trial by affidavit is no substitute for plenary trial by jury, which so long has been the hallmark of "even-handed justice." *See Poller v. CBA, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Therefore, the summary judgment motion with respect to the

---

**8.** The doctrine of equivalents is basically a court created exception—"an anomaly"—logically inconsistent with the provisions of the statute and public policy it reflects, *Royal Typewriter Co. v. Remington Rand, Inc.,* 168 F.2d 691, 692 (2d Cir. 1948), but nonetheless necessary to avoid rendering the patent a hollow and useless thing by permitting "the unscrupulous copyist to make unimportant and unsubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim." *Graver, supra,* 339 U.S. at 607, 70 S.Ct. at 856. It is directed against those who seek to pirate a patented device with impunity by introducing "minor variations to conceal and shelter the piracy." *Id.* The doctrine, therefore, has been applied to give its equitable purpose effect. It is the mere expression and

application of the view that like things are alike and that they are not made unlike by formal and non-substantial changes, no matter how clever the changes in form or contrived the dissimulation. Deller's *Walker on Patents, supra,* § 546.

**9.** Under the doctrine, the nature of the invention determines the breadth of its protection. Because such doctrine rests on equitable considerations, the principle has developed that an inventor, with respect to his patent, is entitled to a range of equivalents commensurate with the scope of his invention: broad if his invention is broad; narrow if his advance is a small one in a crowded field. Deller's *Walker on Patents, supra,* § 546; *Ziegler v. Phillips Petroleum Co., supra,* 483 F.2d at 869 (5th Cir. 1973).

question of non-infringement is hereby denied.[10]

### III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO THE ALLEGED SHERMAN SECTION 1 VIOLATION IS GRANTED.

■ Plaintiffs move for summary judgment in response to Rexnord's counterclaim that Wahl and Vibra Screw have engaged in a conspiracy in restraint of trade against Rexnord via the maintenance of unfounded patent infringement litigation in violation of Sherman § 1. Plaintiffs argue that it is a legal impossibility for Wahl, the licensor, president and sole stockholder of Vibra Screw, to conspire with Vibra Screw, his exclusive licensee under both aforementioned patents charged to be infringed, so as to violate the antitrust laws. Moreover, plaintiffs point out that Wahl cannot act independently of Vibra Screw. For example, in *Tycom v. Redactron Corp. et al.*, 380 F.Supp. 1183 (D.Del.1974), Chief Judge Latchum held that a patentee is an indispensable party to a patent infringement action by the exclusive licensee. *Accord, Rainville Co., Inc. v. Consupak, Inc., et al.*, 407 F.Supp. 221, 223 (D.N.J.1976). Thus, Vibra Screw, as exclusive licensee under both patents, could not bring an action without joining the patent owner, Eugene A. Wahl.

■ It is a basic principal of antitrust law that a corporation cannot conspire with itself, that is, with its officers, agents, and employees, since the acts of the officers are the acts of the corporation. *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911 (5th Cir. 1952); *Goldlawr, Inc. v. Shubert*, 276 F.2d 614 (3d Cir. 1960). Nonetheless, Rexnord relies on *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 921 (N.D.Cal.1975) for the proposition that Wahl can conspire with his own corporation, *i. e.*, Wahl functions with two hats, as patent owner *and* as president of Vibra Screw, the licensee. In each capacity he acts independently and personally since by virtue of a license agreement with Vibra Screw, Wahl is receiving a royalty from Vibra Screw of 2½% of the net sale price of all patented devices sold by Vibra Screw.

Defendant's reliance on *Handgards* is misplaced. In *Handgards*, the district court held that a parent corporation could conspire with its subsidiary corporation. It is *Goldlawr*, instead, which is pertinent to the instant litigation. In *Goldlawr*, the Third Circuit, relying primarily on *Nelson Radio*, affirmed the district court's dismissal of the Sherman § 1 charge that William Goldman, president and owner of the capital stock of William Goldman Theatres, had conspired with William Goldman Theatres to obtain first-run movies to the detriment of plaintiff, Erlanger Theatre. The Third Circuit held, in effect, that a corporation cannot conspire with its officers or agents to violate the antitrust laws.[11]

■ However, this rule does not apply where the agents or officers are "activated by any motives personal to themselves" or are not acting in their "normal capacities." *Nelson Radio & Supply Co., Inc. v. Motorola, Inc., supra*, 200 F.2d at 914. In *Johnston v. Baker*, 445 F.2d 424 (3d Cir. 1971), the Third Circuit suggested comparable limitations on the *Nelson* rationale. The *Johnston* court suggested, for example, that *Nelson* would not apply to a case where some one or more of the defendants "were acting for personal reasons and [where] one of the parties to the conspiracy was not an employee or agent of the corporation." 445 F.2d at 427.[12]

---

10. Of course, if the invalidity of the '508 Patent on the ground of double-patenting is upheld, any issue of its infringement by the Rexnord device becomes moot.

11. *Accord, Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 (9th Cir. 1969); *Carlo C. Gelardi Corp. v. Miller Brew. Co.*, 421 F.Supp. 237, 242 (D.N.J.1976); *Higbie v. Kopy-Kat, Inc.*, 391 F.Supp. 808, 810 (E.D.Pa.1975); *Goldinger v. Boron Oil Co.*, 375 F.Supp. 400, 406 (W.D.Pa.1974).

12. *See Morton Bldgs. of Nebraska, Inc. v. Morton Bldgs. Inc.*, 531 F.2d 910, 917 (8th Cir.

Here, Wahl is receiving, by virtue of a license agreement with Vibra Screw, a 2½% royalty of the net sales price of all patented devices sold by Vibra Screw. It would appear that it is to Wahl's personal advantage to promote greater sales of bin activators for Vibra Screw, resulting in increased royalties to Wahl. However, Vibra Screw is Wahl's "exclusive" licensee. His economic interest is coextensive with that of Vibra Screw's, not apart therefrom. He is not acting independently of Vibra Screw for his own personal benefit, rather he stands to gain only through sales made by Vibra Screw. Since Wahl has made Vibra Screw his exclusive licensee, unless Wahl personally exploits his patent apart from his activity as an officer of Vibra Screw, no one else but Vibra Screw can exercise the patent. Wahl is not exploiting the '508 Patent individually. Hence, the only economic interest he has in the patent is derived through Vibra Screw. The cases discussed above show that where a corporate officer's economic interest in an antitrust violation is derived from that of the corporation he serves, he cannot be said to have conspired with it in violation of the antitrust laws. Accordingly, Wahl, as president, cannot conspire with his own company, Vibra Screw. Given the clear mandate

of *Goldlawr*, summary judgment is granted with respect to the alleged Sherman § 1 violation.

## IV. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO THE ALLEGED SHERMAN SECTION 2 VIOLATION IS DENIED.

The thrust of Rexnord's counterclaim regarding the Sherman § 2 violation is that Wahl and Vibra Screw have initiated an ongoing campaign of unwarranted litigation with respect to the '583 Patent in order to monopolize the vibratory bin activator market. More specifically, plaintiffs brought patent infringement suits against many of their competitors, *i. e.*, Carrier Manufacturing Co., Vibranetics, Inc., Energy, Inc., J. L. Rosium & Co., Solids Flow Control Corp., and Rexnord, for infringement of the '583 Patent. The litigation against Vibranetics, Inc., Energy, Inc., J. L. Rosium & Co., Solids Flow Control Corp., and Rexnord was ongoing and/or filed after the '583 Patent had been declared invalid and after the Supreme Court had rendered its decision in *Blonder-Tongue Labs v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).[13] In

1976) (Gibson, C. J.), wherein the Eighth Circuit noted that the only exception to the general rule arises when the officers or agents were, at the time of the conspiracy, acting beyond the scope of their authority or "for their own benefit." *See also Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974).

**13.** In particular, on November 1, 1965, Wahl and Vibra Screw brought an action in the United States District Court for the Southern District of Indiana against Carrier Manufacturing Co. alleging infringement of the '583 Patent. The district court held that the claims of said patent were invalid and not infringed. The Seventh Circuit affirmed and denied a rehearing en banc. *Wahl and Vibra Screw, Inc. v. Carrier Manufacturing Co., Inc.*, 452 F.2d 96 (7th Cir. 1971), *cert. denied*, 405 U.S. 990, 92 S.Ct. 1255, 31 L.Ed.2d 457 (1972). Meanwhile, plaintiffs filed a similar action against Vibranetics on December 18, 1970 in the United States District Court for the Western District of Kentucky for infringement of the '583 Patent. Judge Bratcher entered summary judgment in favor of defendant on the basis of the Supreme

Court's decision in *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). In view of the Seventh Circuit's recent decision with respect to the '583 Patent, plaintiffs were estopped from asserting any infringement thereof. The Sixth Circuit affirmed. *Wahl and Vibra Screw, Inc. v. Vibranetics, Inc.*, 474 F.2d 971 (6th Cir.), *cert. denied*, 414 U.S. 859, 94 S.Ct. 72, 38 L.Ed.2d 110 (1973).

Thereafter, plaintiffs brought an action against Energy, Inc., a customer of Rexnord's, and J. L. Rosium & Co., a manufacturing representative of Rexnord's, in the United States District Court for the District of Idaho for infringement of the '508 and '583 Patents. The action was dismissed by plaintiffs without prejudice pursuant to Rule 41(a). *Wahl and Vibra Screw, Inc. v. Energy, Inc. and J. L. Rosium & Co., Inc.*, No. 1–75–137 (D.Idaho Sept. 5, 1978).

Finally, on April 30, 1976 and July 21, 1976, plaintiffs filed this case and one against Solids Flow Control Corp., respectively. In both cases infringement of the '583 Patent was claimed. This court dismissed both complaints in regard to the '583 Patent on the basis of

*Blonder-Tongue*, the Supreme Court held that a patentee, whose patent is held invalid in his suit against one alleged infringer, may be precluded, under the doctrine of collateral estoppel, from asserting the validity of the patent in a suit against a different alleged infringer. Accordingly, Rexnord maintains that such litigation has had a chilling impact upon the marketplace, as prospective customers of bin activators are less likely to buy such activators from manufacturers subject to suit for patent infringement.

Plaintiffs move for summary judgment here on the ground that the elements necessary to make up a Sherman § 2 violation have been neither pleaded nor proven. Rexnord has not shown that Wahl and Vibra Screw possess a dangerous probability of monopolizing the relevant market, *i. e.*, a party with monopoly power has the power to control prices or to unreasonably restrict competition in the relevant market. *United States v. DuPont & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Plaintiffs first argue that the relevant market is broader than vibrating bin activators. It includes apron conveyors, five different types of feeders, mass flow bins, and the like. Secondly, there is competition in the market. Plaintiffs do not have the size nor capacity to control prices, as their total sales amount to about one percent of Rexnord's. Wahl concludes that there is no issue of genuine fact with respect to the probability of monopolization, the claim of reduced competition by means of patent litigation is frivolous, and, accordingly, summary judgment is appropriate.

 This court recognizes that the bringing of a series of ill-founded patent infringement actions in bad faith, can constitute an antitrust violation in and of itself, *if* such suits are initiated or pursued with an intent to monopolize a particular

industry and the other elements of a § 2 violation are present. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Handgards, Inc., supra*, 413 F.Supp. at 924–925. However, this type of antitrust violation is a very difficult one to prove. *Crown Machine & Tool Co. v. KVP—Sutherland Paper Co.*, 297 F.Supp. 542 (N.D.Cal. 1968), aff'd, 409 F.2d 1307 (9th Cir. 1969). Moreover, this court recognizes that control of price or competition establishes the existence of monopoly power under § 2. *United States v. Du Pont & Co., supra*, 351 U.S. at 393, 76 S.Ct. 994.

 Given the mandate of *Poller v. CBS, Inc., supra*, that summary judgment in antitrust actions should be employed sparingly, particularly where motive and intent are at issue, summary judgment is not proper at this time. There is a genuine factual dispute with respect to the relevant market, plaintiffs' ability to control prices, and plaintiffs' motive and intent in initiating the multiplicity of patent infringement suits with its effect thereupon the marketplace. It is for the trier of fact to determine whether plaintiffs' ongoing litigation has had such a chilling impact upon the marketplace, *i. e.*, purchasers of bin activators are more likely to buy or have been buying bin activators from a manufacturer not subject to infringement suits so as to reduce competition and to give Wahl a monopoly position in the market. Accordingly, under any reasonable construction of the facts in evidence and under any acceptable theory of law, the party opposing the motion, Rexnord, might be entitled to prevail. *Scooper Dooper, Inc. v. Kraft Co.*, 494 F.2d 840, 848 (3d Cir. 1974). Therefore, the summary judgment motion in regard to the Sherman § 2 charge is denied.

---

*Blonder-Tongue. Wahl and Vibra Screw, Inc. v. Rexnord, Inc.*, No. 76–791 (D.N.J. May 19, 1977) (Order granting partial summary judgment), aff'd, 577 F.2d 731 (3d Cir.), *cert. denied* 439 U.S. 867, 99 S.Ct. 192, 58 L.Ed.2d 177

(1978); *Wahl and Vibra Screw, Inc. v. Solids Flow Control Corp.*, No. 76–1412 (D.N.J. June 24, 1977) (Order granting summary judgment), aff'd, 577 F.2d 731 (3d Cir.), *cert. denied*, 867 U.S. 439, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978).

590

APPENDIX B

UNITED STATES PATENT OFFICE

3,261,508

Patented July 19, 1966

3,261,508

VIBRATORY BIN ACTIVATOR

Eugene A. Wahl, 294 Forest Ave.,
Glen Ridge, N.J.

Filed Jan. 24, 1964, Ser. No. 340,018

17 Claims. (Cl. 222—199)

This invention relates to bin activator apparatus and more particularly to apparatus adapted for attachment to a storage bin, or hopper, to promote a positive flow of material therefrom.

The hoppering problem, that is, the problem of providing a positive, continuous flow of most solids from storage bins, has been, for many years, a vexing and costly bottleneck in continuous or automated processing applications. Wherever solids must be moved from storage into a process, the first step in the process, namely, the continuous discharge of the material from the storage bin, heretofore has defied the most varied and expensive methods for bringing this about. The problem is complex because it involves many variable factors, such as the size, shape and character of the particular material, temperature, humidity, etc. Fibrous, sticky, and the like, materials have a tendency to bridge across even very large horizontal distances. A further problem is the stagnation of the material around the bin walls with the material toward the center of the bin moving out preferentially and resulting in what is commonly called "ratholing."

It has been estimated that industry loses many millions of dollars each year because of process interruptions due to faulty flow of the material out of the storage bin. Additionally, many millions of dollars have been spent in seeking a solution to the problem.

The design of storage bins, per se, has been the subject of extensive and thorough research, both mathematical and empirical. However, experts in this field have found that in spite of the best bin designs, a dependable outflow of the material cannot be obtained without the use of auxiliary devices operatively associated with the bin.

Many auxiliary devices and arrangements have been proposed to promote the flow of material from a storage bin, including vibrators mounted to the exterior surface of the bin, multiple screw conveyors arranged across the bottom of the bin, sweep arms operating as giant agitators within the bin, pulsating pads disposed along the inner wall of the bin, etc. While heretofore known devices and arrangements are each satisfactory for use under limited conditions and with certain materials, none has proven to be satisfactory for use with really difficult-to-handle materials, such as, for example, wet sand, clay, wood chips, etc.

The present invention overcomes the shortcomings of the prior devices of this class. The apparatus is adapted for vibratory attachment to the bottom of a storage bin. Such apparatus is subjected to vigorous vibration and includes means for vigorously agitating the material at the critical point, namely, in the region of the discharge opening of the bin.

An object of this invention is the provision of apparatus adapted for use with a storage bin, or hopper, which apparatus is constructed and arranged to provide a positive discharge of the material from the bin.

An object of this invention is the provision of apparatus for attachment to a storage bin, which apparatus includes means for vigorously agitating the material in the region of the bin discharge opening, and means for controlling the converging flow of the material from the hopper and through an outlet opening provided in the apparatus.

An object of this invention is the provision of apparatus for promoting flow of material from a storage bin, which apparatus is constructed and arranged for effecting a positive discharge of the material, through an outlet opening at a relatively uniform rate during the time that the apparatus is vibrated, and for arresting such discharge of the material when the apparatus is not vibrated.

An object of this invention is the provision of apparatus for attachment to the bottom of a storage bin having a discharge opening at the bottom, which apparatus comprises material-receiving means having concave side walls terminating in an outlet opening, means forming an annular opening defining a flow path for the material from the bin into the material-receiving means,

592

means for imparting vibrations to the apparatus and means for attaching the apparatus in operative position to the bin.

An object of this invention is the provision of bin activator apparatus vibrationally attached to a storage bin, which apparatus comprises a bottom wall formed of a plurality of concentrically-arranged, concave members leading to an output opening, baffle means spaced from the outlet opening, and a gyrator for imparting vigorous vibrations to the apparatus.

These and other objects and advantages of the invention will become apparent from the following description when taken with the accompanying drawings. It will be understood, however, that the drawings are for purposes of illustration and are not to be construed as defining the scope or limits of the invention, reference being had for the latter purpose to the claims appended hereto.

In the drawings wherein like reference characters denote like parts in the several views:

FIGURE 1 is a top plan view of apparatus made in accordance with this invention, with a portion of the baffle member broken away;

FIGURE 2 is a side, elevational view thereof, with a portion of the side walls of the concave members broken away;

FIGURE 3 is a side elevational view showing the apparatus attached to a storage bin, and drawn to a reduced scale; and

FIGURE 4 is an enlarged, fragmentary, view showing the apparatus attached to the storage bin, with certain parts shown, in cross-section.

Reference, now, is made to FIGURES 1 and 2 showing bin activator apparatus made in accordance with this invention. Such apparatus comprises the two metal, dish-shaped members 10 and 11 and a tubular member 12, said members being concentrically arranged and welded together to form a rigid, unitary structure. The base ends of the dish-shaped members 10 and 11 include cylindrical sections of relatively short axial lengths, such sections being identified by the numerals 13 and 14, respectively. It may here be pointed out that the dish-shaped members are obtainable as stock items, in various sizes and contours, thereby affording manufacturing economy, in addition to other advantageous features, as will be described hereinbelow.

In the manufacture of the bin activator apparatus, the bottom of the dish-shaped member 10 is cut out along a desired plane to provide a central opening accommodating the cylindrical portion of the associated dish-shaped member 11 and the two members are welded together along the common circle, as indicated by the weld 15. Similarly, a central hole is cut in the dish-shaped member 11 to accommodate the tubular member 12, these members also being welded together as indicated by the numeral 16. Thus, the members 10, 11 and 12 form an integral assembly with the opening 17 constituting the outlet opening for the discharge of such material as may be contained within the members 10 and 11. The concave, contour of these members results in structural elements of great strength, whereby the members can have relatively thin wall thicknesses resulting in economy of material as well as a reduction in the overall weight of the apparatus. For example, a wall thickness of "16" is sufficient for members having a base diameter up to 10 feet, regardless of the particular material to be hoppered.

A pair of angle iron bars 19 and 20 extend across the interior of the dish-shaped member 10 and have ends welded to the cylindrical base portion thereof. These bars support a third dish-shaped member 21 which is welded thereto. The member 21 is inverted and as a peripheral surface spaced from the inner wall of the dish-shaped member 10 to provide an annular path for the flow of material from the hopper to the members 10 and 11, as will be described in more detail hereinbelow.

Opposed horizontally-disposed mounting plates 22 and 23 have inner sides welded to the dish-shaped member 10, such sides having arcuate shapes conforming to that of the member 10. The mounting plates are

provided with corner holes for receiving tie rods by means of which the apparatus is vibrationally suspended from a storage bin. Spaced pairs of gussets 24.25 and 26.27 are welded to the under surfaces of the respective mounting plates 22 and 23 as well as to the outer wall of the dish-shaped member 10. The aligned end surfaces of the mounting plate 23 and the underlying gussets 26 and 27 are welded to a vertical plate 30 provided with tapped holes for receiving the mounting bolts of a gyrator 31. Such gyrator preferably is a self-contained, fully-enclosed unit comprising an electric motor having a vertical shaft carrying one or more eccentrically-mounted weights. Upon energization of the motor, the weights rotate in a horizontal plane, thereby imparting vigorous vibrations to the apparatus. In the illustrated mounting of the gyrator, the vibrations imparted to the apparatus are predominantly in a direction normal to the vertical axis of the apparatus. Such vibration of the apparatus effectively fluidizes the contained material thereby promoting a positive discharge thereof through the outlet opening 17. The speed of rotation of the eccentrically-mounted weights (of the gyrator) and the amplitude of the vibrations imparted to the apparatus will vary with the size of the particular apparatus and the material to be hoppered. In general, a relatively high rotation frequency may be combined with a relatively lower vibration amplitude. I have found that a vibration frequency of 1800–3000 cycles per minute and an amplitude of 0.020–0.125 inch provides an operating range suitable for use with very large storage bins containing materials which are considered difficult to handle. For example, a gyrator frequency of 1800 r. p. m., in the case of a motor and weights capable of producing a thrust of ⅛ inch, will effectively fluidize contained materials such as wet sand, clay, wood chips, etc.

Reference now is made to FIGURE 3, which shows the bin activator apparatus attached to a storage bin 34 having a concial bottom section 35. Welded to the bin wall are four sets of brackets, only the front sets 36 and 37 being visible in the

view of FIGURE 3. Each set of the brackets includes a horizontal plate provided with a hole for receiving the associated tie rods 38 and 39 having threaded ends. Referring, specifically, to the rod 38, the upper end thereof passes through the hole formed in the horizontal plate 40 and through the vibration isolators 41 and 42, whereas the lower end passes through the hole formed in the mounting plate 22 and through the vibration isolators 43 and 44. A desired spacing between the lower end of the bin and the bin activator apparatus is obtained by means of suitable nuts applied to the rods, as will be explained hereinbelow with reference to FIGURE 4. Suffice to say, for the present, that the annular space between the upper cylindrical portion of the dish-shaped member 10 and the wall defining the discharge opening of the hopper is closed by a resilient band 45 secured in place by two circular straps 46, 47. By suspending the bin activator apparatus from the bin, by means of the four tie rods and the associated vibration isolators, the apparatus is relatively free to vibrate in response to the vibratory thrust forces applied thereto by the eccentrically-mounted weights of the gyrator 31.

The details of the mounting arrangement for vibrationally supporting the bin activator apparatus in operative position on the storage bin is best shown in the enlarged fragmentary view of FIGURE 4. This view shows one of the triangular, vertical plates of the bracket as identified by the numeral 36 and the horizontal plate 40. The upper vibration isolator 41 includes a shank portion passing through the hole formed in the plate 40 and abutting against the lower vibration isolator 42. The upper end of the tie rod 38 is secured in position by means of the nuts 50 and 51 seaed against the flat washers 52 and 53, respectively. The lower end of the tie rod secured in position by means of the bolts 54 and 55 and the washers 56 and 57, respectively positioned on opposite sides of the mounting plate 22 and seaed against the vibration isolators 43, 44. The vibration isolators, or mounts, 41–44 preferably are made of rub-

ber. It will be apparent that four tie rods and associated vibration mounts (all similar to the tie rod and mounts just described) vibrationally support the bin activator apparatus in operative position relative to the bin.

A ring 60, having an L-shaped cross-section, encircles the conical wall 35 of the bin, and is welded thereto as well as to the horizontal plate 40. The vertical wall of the ring 60 is aligned with and spaced from the end of the cylindrical section 13 of the dish-shaped member 10, and the space therebetween is closed by the band 45 made of rubber, or other suitable flexible material. This band is secured in position by the two metal straps 46 and 47, each strap being provided with conventional means, such as a turn-buckle, by means of which the band 45 may be drawn up tightly around the ring 60 and the section 13.

It will now be clear that the inverted dish-shaped member 21 constitutes a baffle supporting the load of the material contained within the hopper, and that the annular space, having a vertical height (Y), constitutes the path for the flow of the material from the dish-shaped member 10 into the dish-shaped member 11. Unless the bin activator apparatus is vibrated, material may pass through the gap (Y) or may bridge across this gap. If the material passes through the gap, as a free-flowing material, it will come to rest on the surface (S). In any case, material flow from the hopper is, for all practical purposes, arrested until the apparatus is vibrated by the gyrator.

The spacing (Y), between the baffle 21 and the dish-shaped member 10, will depend upon the particular material to be handled. Free-flowing materials generally require a lower baffle position than non-free-flowing materials. In fact, some materials having pronounced bridging properties may require no baffle at all, as the inherent bridge effect approaches the function provided by the baffle, that is, supporting the head load of the material above the final discharge outlet 17. However, the baffle is preferred in all cases to insure discharge of the material from the bin on a first-in, first-out basis.

When the gyrator is operating, material bridged across the gap (Y) is subjected to vigorous vibrations, which action tends to unlock the material particles that normally would bridge over this gap. Once the material releases from gap (Y), it proceeds rapidly to the dish-shaped member, or sump, 11, which acts as an accumulator over the final outlet opening 17. Material will accumulate in the sump for a depth of several inches and since this material is in a state of vigorous agitation, it assumes pseudo-fluid characteristics and will, therefore, exit through the outlet opening 17 much like a liquid stream. If the tubular member 12, forming the outlet opening, were to be connected directly to the larger dish-shaped member 10, instead of the sump 11, material would have to enter the tubular member over the edge of intersection of the members 10 and 12, as over a weir, which would greatly retard outflow of the material.

In a bin activator made as herein-described, the vibratory progression of the material toward the final outlet 17 is aided by the downward sloping surface of the dish-shaped member 11. The average slope of the dish-shaped members 10 and 11, taken between the points identified by the letters (M) and (N), preferably should be less than 45 degrees with the horizontal. Such slope results in a positive discharge of the material through the outlet 17 when the gyrator is operating, while, at the same time, preventing discharge of the material when the gyrator is not operating.

The material discharge rate from a bin activator of the described dished-head construction is, extremely uniform, being of the order of 5 percent deviation, minute-to-minute, irrespective of the amount of material in the storage bin, or hopper. Thus, the described apparatus not only assures a positive flow of material from the storage bin, but also provides a reasonably uniform material flow rate through the outlet opening 17.

The absence of material flow out of the final outlet opening, when the gyrator is

not operating, eliminates the requirement for shut-off gates. Even in the case of relatively free flowing materials, the material which may pass through the annular opening (Y), by gravity flow, merely accumulates on the surface (S) of the lower dish-shaped member.

Storage bins, or hoppers, generally are designed to be filled rapidly and to hold a relatively large quantity of material for subsequent discharge at a desired flow rate continuous or over spaced time periods. These requirements normally lead to a hopper design wherein the bottom portion is tapered, or funnel-shaped, terminating in a relatively small discharge opening. Such construction results in a congestion and packing of the material at the hopper discharge opening. This compacting effect is aggravated in the case of sticky materials (such as wet sand) which have a tendency to bridge across even large horizontal distances and in the case of materials consisting of irregularly-shaped pieces (such as wood chips) wherein the pieces become interlocked physically. These factors, and others, result in the disruption of material flow out of the hopper opening. In apparatus made in accordance with this invention, the hopper discharge opening purposely is made relatively large, that is, considerably larger than required for the desired material flow rate. Substantially all movement of the material out of the main part of the hopper is arrested by the baffle member 21 and the inner surface of dish-shaped member 10. Thus, down to the level of the baffle, only a relatively slight convergence of the material takes place. The principle converging action is reserved for the zone below the baffle where the material has complete freedom of movement. Within this zone, the material moves freely because it is unhindered by the head load of the material within the hopper, because the material in this zone is subject to vigorous agitation, and, also, because the area under the baffle is never completely full. The annular gap (Y), being vigorously vibrated, results in the release of the particles through this gap more or less on an individual basis. This arrangement facilitates not

only the flow of the material out of the final outlet opening, but also movement of the material down from the upper regions of the hopper. Having provided for removal of the material in the region of the discharge opening in the bottom of the hopper, there is created a decongested zone immediately above the baffle which then permits the overlying material to follow down readily. In the case of materials having a pronounced tendency to bridge, such as, for example, wet sand, wood chips, and the like, it may be necessary to apply a small amount of vibration to the side walls of the hopper, as by means of small vibrators, or gyrators 65, 66 shown in FIGURE 3. These auxiliary vibrators need apply only a very small amount of vibration to the hopper wall in order to effect a collapse of the bridging material because of the void created in the lower zone of the hopper as the material moves through the annular opening (Y) during vibration of the bin activator apparatus.

Having now described the invention and principles of operation, those skilled in this art will be able to make various changes and modifications without thereby departing from the scope and spirit of the invention as recited in the following claims.

I claim:

1. Apparatus for promoting the flow of material from a storage hopper having a discharge opening formed in the bottom thereof, said apparatus comprising,

(a) a material-receiving member having a bottom wall defined by a plurality of concave surfaces terminating in a central outlet opening,

(b) means vibrationally suspending the material-receiving member from the hopper and in spaced position to the hopper wall, and

(c) means for vibrating the material-receiving member.

2. Apparatus for promoting the flow of material from a storage hopper having a discharge opening formed in the bottom thereof, said apparatus comprising,

(a) a material-receiving member having a bottom wall defined by a plurality of concave surfaces terminating in a central outlet opening,

(b) a baffle member rigidly secured to the material-receiving member and having a peripheral surface spaced from the inner wall of the material-receiving member,

(c) means vibrationally suspending the material-receiving member from the hopper and in spaced position to the hopper wall, and

(d) means for vibrating the material-receiving member.

3. The invention as recited in claim 2, wherein the baffle member is of convex form and wherein the said means for vibrating the material-receiving member is a gyrator mechanically-coupled to the material-receiving member, said gyrator comprising an eccentrically-mounted weight rotatable by an electric motor.

4. The invention as recited in claim 3, wherein the eccentrically-mounted weight is rotatable in a plane substantially normal to the axis of the said material-receiving member.

5. The invention as recited in claim 3, wherein at least a portion of said baffle member extends into the hopper discharge opening.

6. Apparatus for promoting the flow of material from a storage hopper having a conical lower portion terminating in a hopper discharge opening, said apparatus comprising,

(a) a first concave member having a central opening formed therein and a cylindrical base portion,

(b) a second concave member secured to the first concave member and having a central opening formed therein,

(c) a baffle member secured to the first concave member and having a peripheral surface spaced from the inner wall of the said concave member,

(d) means vibrationally suspending the first concave member from the hopper, with the said cylindrical base portion spaced from the hopper wall, and

(e) means for vibrating the said three members as a unit.

7. The invention as recited in claim 6, wherein the said baffle member is an inverted dish-shaped member having a diameter substantially equal to the central opening in said first concave member.

8. The invention as recited in claim 6, wherein the said means for vibrating said three members is a gyrator mechanically-coupled to the said first member, said gyrator comprising an eccentrically-mounted weight rotatable upon energization of an electric motor.

9. The invention as recited in claim 8, wherein said weight is rotatable in a plane substantially normal to the axis of said first concave member.

10. The invention as recited in claim 6, including a flexible band closing the space between the walls of the hopper and the said cylindrical portion of said first concave member.

11. The invention as recited in claim 6, wherein a straight line drawn from a point on the maximum diameter of the said first member to the wall defining the central opening in said second member has a slope of less than 45 degrees with the horizontal.

12. Bin activator apparatus for use with a storage hopper having a tapered bottom wall terminating in a discharge opening of predetermined size, said apparatus comprising,

(a) a first concave member having a central opening formed therein and a cylindrical section having an inside diameter greater than the hopper discharge opening,

(b) a second concave member having a central opening formed therein and a cylindrical portion secured to and extending from said first member,

(c) a third concave member having a diameter less than that of the hopper discharge opening,

(d) spaced supporting members disposed in and secured to the said first member,

(e) means rigidly securing the said third member to the supporting members, with said third member being reversely disposed to and concentric with said first member, and

(f) a gyrator mechanically coupled to the said first member, said gyrator comprising an eccentric weight rotatable by an electric motor thereby to impart vigorous vibrations to the apparatus.

13. The invention as recited in claim 12, wherein a straight line drawn from a point on the maximum diameter of said first member to a point on the wall defining the central opening in said second member has a slope of less than 45 degrees with the horizontal.

14. The invention as recited in claim 12, wherein the said third concave member has a base diameter substantially equal to that of the central hole formed in said second concave member.

15. The invention as recited in claim 12, including a tubular member secured to and extending from said second concave member, said tubular member being concentric with the central opening formed in said second concave member.

16. The invention as recited in claim 12, including means for suspending the apparatus from a storage hopper.

17. The invention as recited in claim 14, wherein the means for suspending the apparatus from a hopper comprises a pair of oppositely-directed mounting plates secured to the outer wall of said first concave member, each plate being provided with spaced holes.

References Cited by the Examiner

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 3,178,068 | 4/1965 | Dumbaugh | 222—161 |
| 3,216,626 | 11/1965 | Gaucct | 222—199 |

ROBERT B. REEVES, *Primary Examiner.*

HADD S. LANE, *Examiner.*

## ON MOTION FOR RECONSIDERATION

Plaintiffs have moved for reconsideration of this Court's opinion dated January 25, 1979, and the order entered pursuant thereto. In that opinion, this Court found, *inter alia* that plaintiffs' utility patent No. 3,261,-508 ('508 Patent) was invalid for double patenting in view of plaintiffs' earlier-issued design patent No. 202,068 ('068 Patent). *Wahl v. Rexnord, Inc.,* No. 76–791 D.N.J., Jan. 25, 1979) (order granting partial summary judgment).[1]

Plaintiffs now assert that Vibra Screw has made and sold bin activators which include differing interior and exterior surfaces. In particular, twenty-six such units were sold to fourteen different customers for the years 1977 and 1978. Also, twenty-five similar units were sold in 1978 to a customer in Texas. *See* Wahl Affidavit, filed Mar. 16, 1979. The industry practice is such that the interior configuration is often nonconforming to the exterior surface, *e. g.,* Rexnord, Carman, and Vibranetics follow such a practice. For the foregoing reasons, plaintiffs conclude that the '508 utility patent should not have been held invalid on the ground that the '068 design patent had, in effect, claimed the structures possessing the functional interior configuration of the '508 utility patent. Alternatively, they argue, there is a serious question of material fact with respect to such issue and, hence, summary disposition is inappropriate.

Defendant Rexnord points out that Wahl admitted in his deposition testimony that the only major difference between the two patents in the material-receiving member of the bin device was with the baffle. *See*

1. In particular, defendant first moved for summary judgment, contending, in part, that the '508 Patent was invalid for double patenting. Thereafter, plaintiffs filed a cross-motion for summary judgment asserting that the '508 Patent was not invalid. This Court granted Rexnord's application for summary disposition invalidating the '508 Patent.

Wahl Deposition, May 19, 1977, at 49. In addition, Wahl seeks to supplement the record subsequent to the summary judgment hearing with newly proffered evidence. Such evidence indicates the sale by Vibra Screw of a relatively few hybrid and non-conventional bin activators having a slide plate attached to the interior of their conventional double concave surface.

Rexnord contends that this motion is more properly designated a Rule 60 motion rather than a motion under Rule 52. Rule 60(b)(2) provides that

> the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).

Fed.R.Civ.P. 60(b)(2); 7 *Moore's Federal Practice* ¶ 60.23[4] (2d ed. 1971). The proffered material submitted cannot be introduced however, since it was clearly within the knowledge of Wahl and Vibra Screw prior to the close of the record in this case. Accordingly, defendant requests that the motion be denied.

 Plaintiffs' motion for reconsideration of this Court's prior opinion and order thereto is denied.[2] Attention is directed to *Ropat Corp. v. McGraw-Edison Co.*, 535 F.2d 378 (7th Cir. 1976), and *In re Thorington*, 418 F.2d 528, 57 C.C.P.A. 759 (1969), *cert. denied*, 397 U.S. 1038, 90 S.Ct. 1356, 25 L.Ed.2d 649 (1970).[3] In *Ropat*, the Seventh Circuit was faced with a similar factual scenario; however, there the invention was a corn popper. The earlier-issued design patent for the corn popper set forth the ornamental design thereof, while the

later-issued mechanical patent described a corn popper composed primarily of a base and a dome cover. The patentee, Ropat Corp., sued McGraw-Edison for infringement of the utility patent. In its motion for summary judgment, McGraw-Edison raised the defense of double patenting, arguing that the later-issued mechanical or utility patent was invalid because both it and Ropat's earlier-issued design patent claimed the "same invention." 535 F.2d at 380. The district court granted the motion and the Seventh Circuit affirmed.

Writing for the panel, Circuit Judge Castle set forth the applicable standard in analyzing double patenting situations: "double patenting exists if the feature in which the novel esthetic effect resides is the identical feature which produces the novel function so that a structure embodying the mechanical invention would of necessity embody the design, and vice versa." 535 F.2d at 381. The novel feature constituting the design claimed in the design patent was the large flattop dome cover of the corn popper, the volume of which was greater than that of the pan in the base. The *Ropat* Court reasoned that this novel design feature clearly produced the novel "pop-flip-serve" function which formed the essence of the utility patent claims. A person following the design patent would infringe the utility patent since it was capable of functioning in the precise manner as claimed in the utility patent. The Court thus held the utility patent invalid for double patenting.

In *In re Thorington*, the United States Court of Customs and Patent Appeals reached a similar result. There, the Patent Office Board of Appeals affirmed an examiner's rejection of certain claims of the utili-

---

2. Plaintiffs have brought this motion pursuant to Federal Rule of Civil Procedure 52(b) which allows a court to amend its findings and the judgment accordingly, provided the moving party files such motion within 10 days after an entry of judgment. Plaintiffs filed the instant motion on March 16, 1979, eight days subsequent to the entry of this Court's order of March 8, 1979. The motion, therefore, is properly before this Court.

Defendant's assertion that this motion is more properly designated as a Rule 60(b) mo-

tion is incorrect. The evidence presented by Wahl, *see* Wahl Affidavit, *supra*, is not newly discovered evidence within the scope of Rule 60(b). 11 C. Wright and A. Miller, *Federal Practice and Procedure*, Civil § 2859 (1973).

3. *See generally* Gambrell, *Mechanical and Design Inventions, Double Patenting Rejections and the Doctrine of Election*, 45 N.Y.U.L.Rev. 441 (1970).

ty patent for a fluorescent lamp on the basis of double patenting. Although the earlier-issued design patent did not set forth the exact structure and function of the lamp, the Court, in affirming the Patent Office Board of Appeals, emphasized that the design patent protects an article of manufacture. A fluorescent lamp necessarily contemplates the various features of electrodes, ionizable gas, and fluorescent coatings on the envelope. Anyone wishing to make a fluorescent lamp by conventional techniques after the expiration of the design patent would still be confronted by the claims of the later-issued mechanical patent, thereby extending the patentee's monopoly position with respect to the subject invention.

In the instant case, we are faced not with a corn popper or fluorescent lamp, but rather a storage bin promoter. The earlier-issued design patent sets forth the ornamental design thereof, while the later-issued utility patent describes a bin with the novel feature of the material-receiving member having dish-shaped sides.[4]

This Court, in its earlier opinion, relying primarily on *Ropat* and *In re Thorington*, found the utility patent invalid for double patenting. Plaintiffs had contended that a bin discharging device, embodying the exterior configuration of the design patent, could include an interior configuration differing from that in the utility patent, thereby precluding a finding of double patenting. Such argument was found to be unpersuasive. First, such a configuration appeared to be a strained effort in order to produce differing bins. Second, a person following the design patent would, in effect, infringe the utility patent since it was capable of "functioning" in the same manner claimed by the mechanical patent. Plaintiffs now ask this Court to reconsider its prior opinion and order in light of the fact Vibra Screw has sold a number of bins having dissimilar exterior and interior configurations. *See* Wahl Affidavit, *supra.*

In its initial opinion, this Court never meant to infer that Vibra Screw could not manufacture a storage bin promoter with nonconforming exterior and interior surfaces. The Elliot Affidavit pointed out that such bins could, indeed, be constructed. *See* Elliot Affidavit, attached to Hubley Affidavit, filed Sept. 1, 1978. However, the Seventh Circuit's decision in *Ropat* leads this Court to the conclusion that if, for example, a manufacturer had a license under the design patent, such license could not be exercised without infringing the utility patent. In effect, the inventions are the same.

In *Ropat*, the Seventh Circuit dispelled two primary contentions advanced by the patentee: (1) the inventions claimed in the utility patent could be constructed without "copying" the precise shape of the dome, base, handles or legs claimed in the design patent; and (2) the novel "pop-flip-serve" function claimed in the utility patent could not be produced by the design claimed in the design patent since neither the cooking vessel nor the volume thereof were claimed or disclosed in the design patent. 535 F.2d at 382. A finding of double patenting, the Court reasoned, turned not on the niceties of precise ornamentation but rather upon the presence or absence of design features which produced the novel function claimed in the utility patent as well as upon a functional inquiry since a design patent is granted on an article of manufacture. *Id.*

Here, the design features present in the '068 Patent do produce the novel function claimed in the utility patent, *i. e.*, the material-receiving member of the bin promoter consists of dish-shaped surfaces which effect a positive flow of material from the upper regions of the storage bin when the gyrator is operating and, at the same time, arrest such discharge when the gyrator is not operating. This novel design feature thus forms the essence of the utility patent claims.

---

4. For a complete description of both the earlier-issued design patent and the later-issued utility patent, see this Court's opinion in *Wahl v.*

*Rexnord, Inc.*, at 576 580, 590 597 (D.N.J. 1979) (order granting partial summary judgment).

This court recognizes that differences between the two patents can and do exist.[5] However, such differences are not significant. Viewing the design patent in its most practical light, it is readily apparent that a manufacturer making a bin promoter in the most functional and feasible manner in accordance with the '068 Patent would "of necessity" embody the mechanical invention, unless superfluous steps were taken, or an individual customer placed a special or unique order. *See Ropat Corp. v. McGraw-Edison Co., supra*, 535 F.2d at 381; *In re Hargraves*, 53 F.2d 900, 901 (Cust. & Pat. App.1931). *See also In re Aslanian*, 200 U.S.P.Q. 500 (C.C.P.A.1979).[6]

█ Furthermore, it is to be emphasized that a design patent is granted pursuant to an article of manufacture, 35 U.S.C. § 171, not just on appearance.[7] A storage bin promoter of such design as set forth in the '068 Patent has a well-defined meaning which necessarily includes those elements recited in the claims of the '508 Patent, *e. g.*, a gyrator, a baffle, a central outlet opening, and a material-receiving means having concave side walls. United States Patent Office, Serial No. 3,261,508 patented July 19, 1966, for "Vibratory Bin Activator," claims 1–17. A bin promoter of such design would thus clearly be capable of "functioning" in the precise manner as claimed in the utility patent. In effect, the utility patent depends on its design to create invention.

Declining to hold the utility patent invalid would constitute an unreasonable extension of the monopoly secured by plaintiffs' design patent. Anyone wishing to make a bin promoter in accordance with the '068 Patent after its expiration would be confronted with the claims of the '508 Patent, so that the invention claimed in the design patent would remain unavailable to the public for a number of years thereafter. *In re Thorington, supra*, 418 F.2d at 532, 57 C.C.P.A. 759; *see In re Phelan*, 205 F.2d 183, 184, 40 C.C.P.A. 1023 (1953).

Accordingly, in view of the foregoing analysis, plaintiffs' motion for reconsideration is denied.

---

5. It should be made clear that while, on the one hand, Wahl vigorously contends that differences do exist between the two patents, *see* Wahl Affidavit, *supra*, at deposition, in response to a question pertaining to differences between the material-receiving member and baffle as shown in both patents, Wahl aptly stated: "[o]nly *one* difference, really, that is apparent from the sketchy presentation in the [design] patent, and that has to do with the *baffle*." Wahl Deposition, May 19, 1977, at 49 (emphasis added).

Likewise, Rexnord's expert, Don Fischer, a patent attorney, a former professor of electrical and industrial engineering, and a former Dean of the School of Engineering at Washington University in St. Louis, stated, *via* affidavit, that the only difference between the material-receiving member of both patents was the baffle, otherwise, the "structures are substantially identical." Fischer Affidavit, filed June 22, 1978, at 10.

Furthermore, at deposition, Fischer, in response to the same question, explained he was not merely assuming that the interior and exterior configurations were identical. Instead, he was relying upon the File History of the '068 design patent itself. The File History showed that Wahl, acting pursuant to the Patent Office Examiner's instructions, sent literature displaying a device with a concave surface on the inside. It would be "absolutely ridiculous," Fischer pointed out, in an industrial design for one who extols a concave design, *i. e.*, Wahl, to have differing interior and exterior configurations. The former Engineering Dean concluded he had "no doubt" that the material-receiving member interiorly in the '068 design patent had a plurality of concave surfaces. Fischer Deposition, Sept. 1, 1978, at 35–38, 51–54, 58. For pertinent sections of the File History of the '068 design patent, see Appendix A(3)–(10).

6. In *In re Aslanian*, the United States Court of Customs and Patent Appeals recently highlighted this point when it aptly stated: "[i]n determining what a design patent teaches or fairly suggests to one skilled in the art, it must be remembered that although patentability of a design may not be based upon functional considerations, the specific disclosure of structure in a design patent application may inherently teach *functional features*." 200 U.S.P.Q. at 503 (emphasis added).

7. Plaintiffs cannot find solace in such cases as *In re Swett*, 451 F.2d 631 (C.C.P.A.1971); *In re Dubois*, 262 F.2d 88, 46 C.C.P.A. 744 (1958); *Mr. Hanger, Inc. v. Cut Rate Plastic Hangers, Inc.*, 372 F.Supp. 88 (E.D.N.Y.1974). In each of those cases, the utility patent was not interrelated to the design patent but was susceptible of many different appearances, which were often documented in the utility patent itself. In the instant case, the bin activator as claimed does not have a wide variety of appearances.

APPENDIX · A

DEC--4·63 6 8 4 5 9 A **337** 1

IN THE UNITED STATES PATENT OFFICE

TO ALL WHOM IT MAY CONCERN:

 BE IT KNOWN THAT I, EUGENE A. WAHL, a citizen of
the United States of America, residing at Glen Ridge, County
of Essex, State of New Jersey, have invented a new, original
and ornamental design for *a Storage Bin Flow Promoter,* ~~APPARATUS FOR PROMOTING FLOW OF~~
~~MATERIAL FROM A STORAGE BIN,~~ of which the following is a
specification, reference being had to the accompanying drawing
forming part hereof and wherein:

 Figure 1 is a front, elevational view of *a storage Bin flow promoter,* ~~apparatus~~
 ~~for promoting flow of material from a~~
 ~~storage bin and~~ embodying my new design;

 Figure 2 is a side, elevational view thereof; and

 Figure 3 is a top plan view thereof.

 The dominant features of my new design reside in the
portions, shown in full lines.

I CLAIM:

 The ornamental design for *a storage Bin flow promoter,* ~~apparatus for promoting~~
~~flow of material from a storage bin~~ as shown and described.

65/WOW

AUG 3

D-202068

FIRST OF DRAWING AS ORIGINALLY FILED

Fig-1

Fig-2

Fig-3

EUGENE A. WAHL
INVENTOR.

BY
Rudolph J. Quick
ATTORNEY

POI-00
8-20-63
ADDRESS ONLY
THE COMMISSIONER OF PATENTS
WASHINGTON, D. C. 20231

PAPER No. 2

**U. S. DEPARTMENT OF COMMERCE**
PATENT OFFICE
WASHINGTON

IN REPLY PLEASE REFER TO:

Rudolph J. Jurick
744 Broad St.
Newark 2, N. J.

*Please find below a communication from the EXAMINER in charge of this application.*

*Commissioner of Patents.*

| | |
|---|---|
| *Applicant:* Eugene A. Wahl | |
| *Ser. No.* D-77,588 | **MAILED** |
| *Filed* Nov. 27, 1963 | **APR 27 1964** |
| *For* APPARATUS FOR PROMOTING FLOW OF MATERIAL FROM A STORAGE BIN | **GROUP 430** |

16—68457-7 GPO

This application has been examined.

References cited as the result of a cursory search:

Peterson D-193,213 July 10, 1962 D55/1

Consumer Packaging, Sept. 1960, page 40, No. 15RF2
 Colton-Hope Two-Line High-Speed Automatic at
 top center of page. (Copy in Des. Lib.)

The broken line showing of the ribs in Fig. 3 is informal as indicating hidden structure and should be deleted.

Any proposed drawing corrections should be submitted in a separate letter to the Draftsman.

The claim is rejected as indefinite in that the term "Apparatus" is not directed to a specific definite article of manufacture and is therefore informal in Design Patent applications (MPEP 1503.01). A new title is required.

In order that an apt designation may be provided and for purposes of classification and possible further

search, applicant is requested to submit a statement
as to the exact nature of the design, i. e., does
it function as a pump, blower, etc. Any advertising
brochures etc., if available, should also prove
helpful.

The claim is rejected.

WCWatson:lch

Wallace R. Burke
Examiner

IN THE UNITED STATES PATENT OFFICE

In the application of

Eugene A. Wahl

Serial Number D-77,588

Filed November 27, 1963

APPARATUS FOR PROMOTING FLOW
OF MATERIAL FROM A STORAGE BIN

RECEIVED

SEP 25 1964

GROUP 490

Received

3/Amdt a

Response to official action
dated April 27, 1964

Newark, New Jersey
September 22, 1964

Hon. Commissioner of Patents
Washington 25, D. C.

SIR:

Kindly amend the application as follows:

Change the title to;

Storage Bin Flow Promoter

## R E M A R K S

The apparatus is adapted for attachment to a storage bin for the purpose of promoting a flow of material out of the bin by means of vibrations.

Attached hereto is a copy of Bulletin BA-2, published by applicant's assignee and describing apparatus of the class here sought to be patented.

Accompanying this amendment is a letter authorizing the Chief Draftsman to correct the drawing in accordance with the Examiner's suggestion.

It is apparent the prior art of record does not anticipate the claimed apparatus. Unless more pertinent art can be developed, the application now is in condition for allowance, which action respectfully is solicited.

Respectfully submitted,

*Rudolph J Gurwick*

Attorney for Applicant

606

# MOVE ANY MATERIAL FROM ANY BIN
### WITH THE *Vibra Screw*
## BIN ACTIVATOR

BULLETIN 1-2

## POSITIVELY EFFECTIVE—LOW IN COST

This unique, vibrating baffle and bin bottom design, for new or existing storage structures, can move any material from any bin.

No more bridging, arching, ratholing or spasmodic flow.

If you can put it in the bin ... the bin activator can move it out ... in a first-in — first-out positive stream!

Pat. Pending

Specialists in precision metering and hoppering of dry materials.
# VIBRA SCREW® FEEDERS, INC.
156 HURON AVE., CLIFTON, N. J. 07013 • (201)-773-6240

# *Vibra Screw®*

## Bin Activator for positive and continuous movement of dry materials from storage to process

## PRINCIPLES OF OPERATION

The amazing success of the Vibra Screw Bin Activator is based on a dramatically simple solution to these basic problems:

1. *OVERCOMING CONGESTION* in the bottom of a bin, by using a large outlet in the stationary part and confining the discharge funneling action to the highly energized zone of the Bin Activator.

2. *OVERCOMING BRIDGING* in the stationary bin by imparting vibrations directly into the material lying over the gyrating baffle of the Bin Activator.

3. *OVERCOMING JAMMING* of material at final discharge outlet, by carrying the head load on the gyrating baffle.

4. *OVERCOMING RAT-HOLING* by causing flow from the perimeter of the baffle. This eliminates short circuiting down through the center, and encourages flow equally from the perimeter and the center of the bin. The result: *first-in, first-out* flow of material.

Vibra Screw Bin Activator assures steady flow of material regardless of bin size or configuration. Close-up below shows vibrating baffle.

# Advantages of the *VIBRA SCREW BIN ACTIVATOR*

**1.** Adaptable to new or existing storage structures regardless of size or shape.

**2.** Completely pre-assembled, ready to install.

**3.** Assures first-in, first-out flow.

**4.** Positive discharge of material.

**5.** Eliminates rat-holing, jamming, bridging, arching.

**6.** Permits substantial reductions in bin height with corresponding cost reductions.

**7.** Compact gyrating mechanism, low horse power requirements.

### TYPICAL DIMENSIONS INDICATED FOR 60° OR STEEPER CONE SECTION

| SIZE | A | B | C | D |
|------|-----|--------|---------|------|
| 3' | 36 | 33⅝" | 20¾" | 24" |
| 4' | 48 | 39⅝" | 23½" | 24" |
| 5' | 60 | 45⅝" | 29" | 36" |
| 7' | 84 | 57⅝" | 32" | 36" |
| FOR LARGER SIZES CONSULT VIBRA SCREW | | | | |

It is suggested that recommendations and prints be obtained from factory before detailing.

POL-90
3-29-43

ADDRESS ONLY
THE COMMISSIONER OF PATENTS
WASHINGTON, D.C. 2031

PAPER No. 4

## U.S. DEPARTMENT OF COMMERCE
## PATENT OFFICE
## WASHINGTON

Rudolph J. Jurick
744 Broad Street
Newark 2, New Jersey

*Please find below a communication from the*
*EXAMINER in charge of this application.*

Commissioner of Patents.

IN REPLY PLEASE REFER TO:

| | |
|---|---|
| *Applicant:* Eugene A. Wahl | |
| *Ser. No.* D-77,588 | **MAILED** |
| *Filed* Nov. 27, 1963 | **FEB 18 1965** |
| *For* STORAGE BIN FLOW PROMOTER | GROUP 490 |

U.S. GOVERNMENT PRINTING OFFICE: 1964—O—747-964

Deposit Acct. No.:-- No. of Copies:--

## SHORTENED TIME FOR REPLY

Responsive to communication filed September 23, 1964.

The claim is held allowable.

The proposed drawing corrections are approved and will be executed.

Upon further inspection of the disclosure it has been found to be incomplete in that no showing indicated the presence of an aperture in the bottom of the design. This objection may be overcome by the inclusion of a statement of special description following the dominant features clause and preceding the claim stating that:

> --The bottom of the cylindrical projection on the bottom of the promoter has a conventional cylindrical opening.--

The article --a-- should be inserted before "storage" in the description of Fig. 1 and in the claim.

Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11, 453 O.G. 213.

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE TWO (2) MONTHS FROM THE DATE OF THIS LETTER.

W.C.W:amt
Area Code 202
WO 7-2581

ACTING Examiner

WALLACE R. BURKE

U. S. DEPARTMENT OF COMMERCE

PATENT OFFICE

WASHINGTON

ADDRESS ONLY
THE COMMISSIONER OF PATENTS
WASHINGTON, D.C. 20231

PAPER No. 6

*All communications regarding this application should be to the serial number, date of filing, and name of the applicant.*

MAILED

AUG 3 1965

**GROUP 490**

Rudolph J. Jurick
744 Broad Street
Newark 2, New Jersey

## Notice of Allowance

The issuance of a DESIGN LETTERS PATENT has been approved in the matter of the following application:

APPLICANT Eugene A. Wahl

SERIAL NO. D-77,588 FILED Nov. 27, 1963 TERM 14 YRS.

FOR DESIGN A STORAGE BIN FLOW PROMOTER

The Design Letters Patent will be issued and mailed to you in approximately two weeks.

The following references are made of record:

### UNITED STATES PATENTS

| Name | Number | Date |
|------|--------|------|

SEE NOTICE 804 O.G. 1 JULY 7, 1964

OTHER REFERENCES

By direction of the Commissioner.
WCWatson:cg

*Wallace R. Burke*

Examiner.
ACTING WALLACE R. BURKE

POL-71 (6-64) USCOMM-DC 41464-P64

# United States Patent Office

Des. 202,068
Patented Aug. 24, 1965

202,068

STORAGE BIN FLOW PROMOTER

Eugene A. Wahl, 294 Forest Ave., Glen Ridge, N.J.

Filed Nov. 27, 1963, Ser. No. 77,588

Term of patent 14 years

(Cl. D55—1)

FIGURE 1 is a front, elevational view of a storage bin flow promoter, embodying my new design;

FIGURE 2 is a side, elevational view thereof; and

FIGURE 3 is a top plan view thereof.

The dominant features of my new design reside in the portions, shown in full lines.

The bottom of the cylindrical projection on the bottom of the promoter has a conventional cylindrical opening.

I claim:

The ornamental design for a storage bin flow promoter, as shown and described.

References Cited by the Examiner

UNITED STATES PATENTS

D. 193,213 7/62 Peterson _____ D55—1

OTHER REFERENCES

Consumer Packaging, September 1960, page 40, No. 15RF2 Colton-Hope Two-Line High-Speed Automatic, at top center of page.

WALLACE R. BURKE, Acting Primary Examiner.